(No. 45268.

MILDRED OHLIGSCHLAGER, Appellant, v. PROCTOR COMMUNITY HOSPITAL *et al.*, Appellees.

*Opinion filed Sept. 25, 1973.—Rehearing denied Nov. 28, 1973.*

ELMO E. KOOS, of Peoria, for appellant.

HEYL, ROYSTER, VOELKER & ALLEN, of Peoria (LYLE W. ALLEN and THEODORE R. JOHNSON, of counsel), for appellee Proctor Community Hospital.

WESTERVELT, JOHNSON, NICOLL & KELLER, of Peoria (DAVID A. NICOLL, of counsel), for appellee Joe Cannon, M.D.

MR. JUSTICE GOLDENHERSH delivered the opinion of the court:

In plaintiff's, Mildred Ohligschlager's, action for damages for injury to her person, the circuit court of Peoria County, at the close of plaintiff's case, directed a verdict

and entered judgment in favor of the defendants, Proctor Community Hospital and Dr. Joe Cannon. The appellate court affirmed (6 Ill. App. 3d 81), and we allowed plaintiff's petition for leave to appeal. The pleadings and the facts are reviewed in the opinion of the appellate court and will be discussed only to the extent necessary to this opinion.

On September 13, 1966, plaintiff was experiencing vomiting and diarrhea and called defendant Dr. Joe Cannon. Dr. Cannon came to her home that evening and administered a shot, the next day Dr. Swearingen, Dr. Cannon's partner, repeated the treatment, and on September 15 Dr. Cannon saw her again. At that time she was in acute distress, in a mild degree of shock and was dehydrated. He diagnosed her condition as suffering from severe gastro-enteritis.

Defendant Cannon called defendant Proctor Community Hospital, hereafter referred to as the hospital, in Peoria, and arranged for her admission. He ordered a "blood workup" and intravenous feeding of 1000 c.c. of Electrolyte No. 1. Plaintiff was taken by ambulance from her home in Lacon to the hospital and was admitted at 4:30 P.M. Dr. Cannon arrived at the hospital at about 6:30 P.M. Although the intravenous feeding had been ordered at the time of arranging for plaintiff's admission to the hospital it was not commenced until Dr. Cannon saw her at about 6:30 P.M. Dr. Cannon testified that someone had "tried to insert a needle prior to my arrival" and he inserted the needle in a vein near her right elbow. At approximately 6:40 P.M. 50 milligrams of Sparine was added to the intravenous feeding. Sparine is a compound of Promazine Hydrochloride. A nurse was present when he started the intravenous feeding but he gave her no special instructions. Approximately 15 to 30 minutes later he left plaintiff's room and went to dinner. He returned to the hospital at approximately 10:00 P.M. At that time plaintiff was receiving a second intravenous feeding, the

needle appeared to be properly inserted and the fluid was running at the proper rate. At his direction 75 milligrams of Sparine was added to the intravenous feeding. In both instances when the Sparine was added, it was not placed in the vial, but was inserted into the hose three or four inches from the needle.

Plaintiff testified that after the visiting hours ended at approximately 8:00 or 8:30 P.M. the lights in her four-bed ward were turned off. At about that time she experienced severe pain in her right elbow. Another patient in the room called for a nurse by turning on a light. A nurse's aide came to the room and plaintiff told her about the pain. The nurse's aide said she would see what she could do and left. No one came to the room, and the light was again turned on for a nurse. Plaintiff did not remember anyone responding to her complaint of pain until 7:00 o'clock the next morning, although the hospital chart shows that the second intravenous feeding was completed at 1:00 A.M. and at that time she asked for medicine for pain.

Frieda Haley, the nursing supervisor on the 7:00 A.M. to 4:00 P.M. shift on September 16, testified that she received a report at 7:00 A.M. that plaintiff had been quite ill during the night and she went immediately to her room. In her incident report Mrs. Haley wrote: "Apparently the I.V. solution infiltrated as the next morning her arm at the site of I.V. injection was discolored (white). Ice bags applied per Dr. Cannon's order." She also wrote: "The area on the right arm (inner aspect of elbow) where the first solution was started turned bluish black, became swollen, hard and the outer edges were red. Ice bags applied as ordered. Doctors Cannon and Warren are aware of this situation." Sometime after the incident report was made by the supervising nurse, Dr. Swearingen examined plaintiff and wrote: "Medical findings — large ecchymotic area — extending over entire ulno-volar aspect of arm 3 inches above elbow to 2 inches above wrist. Etiology — infiltration from IV medication."

The testimony shows that the purpose of the intravenous feeding was to correct plaintiff's dehydrated condition and the Sparine was added to the intravenous solution to stop the vomiting. With any intravenous feeding there is a risk of infiltration or extravasation, which is the escape of fluid from the vein into surrounding tissue, and Dr. Swearingen testified that it occurs in connection with 5% to 10% of intravenous feedings. The manufacturer's instructions that came with the Sparine cautioned: "Sparine (Promazine Hydrochloride, Wyeth) when used intravenously should be used in a concentration no greater than 25 mg. per c.c. The injection should be given slowly. Suitable dilution of the more concentrated solution, 50 m.g. per c.c., with an equivalent volume of physiological saline is advised if used intravenously. *** care should be exercised during intravenous administration not to allow perivascular extravasation since under such circumstances chemical irritation may be severe. The intravenous administration *** in a concentration of 50 m.g. per c.c. has resulted in localized thrombophlebitis *** in an extremely small number of cases. *** That injection be made only into vessels previously undamaged by multiple injections or trauma."

Dr. Paul T. Palmer, a physician for 32 years, who practiced in the hospitals in the Peoria area including defendant Proctor, testified that he was familiar with the practice in the community concerning the ordering of intravenous feedings. He testified that he gave no special instructions when an ordinary intravenous solution was used, but when an additive was used he instructed the nurse to watch the patient more carefully. He stated that if Sparine was injected directly into the tubing during an intravenous feeding it could cause a reaction and might cause a thrombosis or breakdown of the blood vessel wall, and fluid in the vein would leak into surrounding tissue. He explained that this breakdown would not happen immediately, that it took time for the substance to

corrode the inside wall of the blood vessel, and that the length of time depended on the concentration and different solutions used, the blood vessel, and the individual anatomy of the person involved.

Dr. Richardson, a plastic surgeon, testified that plaintiff was referred to him by Dr. Cannon and Dr. Swearingen, and he saw her at his office on October 10, 1966. His examination of her right arm revealed an area of skin necrosis and ulceration in the antecubital area. He explained that necrosis is a process of tissue losing life and actually dying and that ulceration is the result of loss of skin over the covering of the body, producing a raw area. He also defined the antecubital area as the elbow. The affected area was about 32 square inches, being basically four inches by eight inches and running from above the elbow to below the elbow.

Plaintiff entered St. Francis Hospital in Peoria on October 20, 1966, and dressings were applied daily to her arm to hasten the body process of determining which cells would live and which would die. On October 27, 1966, Dr. Richardson debrided, *i.e.*, surgically removed the dead tissue, from her elbow. He then took a four-inch-by-eight-inch graft from her abdomen and applied it to her arm. She was released from St. Francis Hospital on November 17, 1966.

Plaintiff contends that there was sufficient evidence that both defendants were negligent and that their negligence was the proximate cause of plaintiff's injury so that applying the rule of *Pedrick v. Peoria and Eastern Railroad Co., 37 Ill.2d 494,* the case should have been submitted to the jury. She argues that the manufacturer's instructions furnished with the Sparine and the testimony of Dr. Palmer prove the professional standard of care which defendant was required to exercise and the causal relationship between his failure to comply with the required standard and her injury. Defendant Dr. Cannon contends that any negligence on his part, and the causal

relationship between his negligence and plaintiff's injury, must be proved by expert testimony, and that none was adduced by plaintiff, that there was no evidence of negligence, that *res ipsa loquitur* "does not apply in Illinois to medical malpractice cases" and that any negligence proved on the part of the defendant hospital is not attributable to him since there is no proof of either a joint venture or a relationship of principal and agent between the parties.

Defendant hospital contends there is no evidence which shows that the treatment rendered to plaintiff deviated from that which was customary and necessary to her care, that there was no expert testimony to support her charges that it was negligent, that the evidence fails to show "a cause and effect relationship" but shows merely that her injury could have resulted from several possibilities, all of which are speculative and conjectural.

We consider first defendant Dr. Cannon's contention which is, in substance, that in the absence of expert testimony plaintiff failed to prove the standard of care which he was required to exercise and that she therefore failed to prove he was guilty of negligence by reason of failure to adhere to that standard. It is true that except in the so-called "common knowledge" or "gross negligence" situations (see *Graham v. St. Luke's Hospital, 46 Ill. App. 2d 147, 158,* and cases cited therein) the appellate decisions have held that expert testimony is essential to the proof of the standard of professional care against which due care must be measured. In our opinion, however, this record presents an appropriate state of facts for applying an exception to the rule. Under the circumstances shown, the explicit instructions furnished by the manufacturer for the proper manner of intravenous injection of the Sparine and the warning of the hazards accompanying its improper administration provide the proof of the proper professional standards which would ordinarily be shown by expert medical testimony. In

*Mulder v. Parke Davis & Co. (1970), 288 Minn. 332, 339-340, 181 N.W.2d 882, 887,* the Supreme Court of Minnesota said: "Where a drug manufacturer recommends to the medical profession (1) the conditions under which its drug should be prescribed; (2) the disorders it is designed to relieve; (3) the precautionary measures which should be observed; and (4) warns of the dangers which are inherent in its use, a doctor's deviation from such recommendations is prima facie evidence of negligence ***" and we agree. Here the manufacturer's instructions contained specific instructions for the use of Sparine and warned of the hazards that could result from its improper administration; Dr. Cannon was familiar with the recommendation that Sparine be used "in a concentration of no greater than 25 m.g. per c.c." and that intravenous administration "in a concentration of 50 m.g. per c.c. has resulted in localized thrombophlebitis" and nevertheless ordered concentrations of 50 m.g. and 75 m.g. injected directly into the intravenous tubing. Although Dr. Cannon was familiar with the manufacturer's *caveat* that "care should be exercised during intravenous administration not to allow perivascular extravasation since under such circumstances chemical irritation may be severe" he did not instruct the nurse to watch more carefully than normal for extravasation. We hold that there was sufficient evidence of deviation from the manufacturer's recommendations and instructions for the issue of defendant Dr. Cannon's negligence to have been submitted to the jury.

We consider next the contentions of the parties with respect to whether there was sufficient evidence of the causal relationship between Dr. Cannon's negligence and plaintiff's injury to require submission of that issue to the jury. It is true that, as stated by the appellate court, the testimony of the physician witnesses was to the effect that the infiltration could have been caused in any of the following ways: "(a) by the improper insertion of the needle; (b) when the needle was withdrawn; (c) by seepage

through the walls of the vein; and finally (d) by thrombosis or a breakdown of the blood vessel wall" (6 Ill. App. 3d 81, 89), and that Dr. Cannon testified that the needle was properly inserted, but we do not agree with defendant Cannon that plaintiff was required to adduce expert testimony to show specifically which of these possibilities caused the injury. Plaintiff testified of "terrible pain" suffered during the intravenous feeding, Dr. Cannon testified that the pain could have been caused by the Sparine's seeping through the walls of the blood vessels or outside the blood vessels as the result of a breakdown of their walls, and Dr. Palmer testified that if the Sparine was injected into the tubing immediately "before the arm" it could cause a reaction in the nature of a thrombosis or could have caused a breakdown in the blood vessel wall with resultant infiltration into the surrounding tissue. In *Lindroth v. Walgreen Co., 407 Ill. 121,* the court said, "In *Devine v. Delano, 272 Ill. 166,* and *Town of Cicero v. Industrial Com., 404 Ill. 487,* this court held the rule to be that reasonable inferences may be drawn from established facts and all that can be reasonably required to establish controverted facts, whether the evidence be direct or circumstantial, is that the evidence creates a greater or less probability leading, on the whole, to a satisfactory conclusion" (407 Ill. 121, 133-134), and, after briefly discussing additional relevant facts, went on to say, "The inquiry here is whether the result reached below was one which is reasonable on the facts in evidence, not whether other conclusions might also have been reached." (407 Ill. 121, 134.) We hold that plaintiff was not required to prove specifically which of the possibilities caused the extravasation and that there was sufficient evidence of the causal relationship so that the trial court erred in directing a verdict in favor of the defendant Dr. Cannon.

We are also of the opinion that there was sufficient evidence adduced from which the inferences could be drawn that defendant Proctor was negligent, and that its

negligence contributed to cause plaintiff's injury. Plaintiff testified that the gauze around her arm became tight because of swelling and she suffered terrible pain. Although a nurse's aide was told of the pain and swelling shortly after 8:30 P.M. the intravenous feeding was not discontinued until 1:00 A.M. The testimony of Mrs. Haley, the nursing supervisor, shows that it was the duty of the nurses to make periodic checks and observe the condition of the needle and whether the fluid was flowing. She stated that in the "in-service" orientation programs at the hospital the problem of infiltration or extravasation is discussed and the nurses are warned of the dangers which accompany the administering of certain types of intravenous fluids. She testified that "if a patient complained of pain at the injection site the I.V. feeding should be discontinued immediately. Pain and swelling are symptoms of extravasation."

As we said in *Darling v. Charleston Community Memorial Hospital, 33 Ill.2d 326,* the defendant hospital was under a duty to "conform to the legal standard of reasonable conduct in the light of the apparent risk." Plaintiff's amended complaint charges that the defendant hospital failed to heed plaintiff's complaints of severe pain and swelling and failed to properly supervise the injection and feeding of the fluids and additives ordered administered to her by defendant Cannon. Under the rule of *Pedrick,* the evidence was sufficient to require submission of the issues to the jury and the circuit court erred in directing a verdict. For the reasons stated the judgments of the circuit court of Peoria County and the appellate court are reversed and the cause is remanded to the circuit court of Peoria County for further proceedings consistent with this opinion.

*Reversed and remanded.*