(No. 6474

VIRGIE WRIGHT, Administrator of the Estate of ANTHONY JONES, Claimant, *v.* STATE OF ILLINOIS, Respondent.

*Opinion filed August 3, 1978.*

MAHONEY & MCARDLE, by JOSEPH P. BUELL, Attorneys for Claimant.

WILLIAM J. SCOTT, Attorney General; SAUL WEXLER, Assistant Attorney General, for Respondent.

HOLDERMAN, J.

The Claimant, Virgie Wright, administrator of the estate of Anthony Jones, deceased, brings this action for negligence against the State of Illinois. Said negli-

gence is alleged to have caused the death of Anthony Jones on January 27, 1971, while he was an inmate at the Illinois State Training School for Boys at Sheridan, Illinois.

The alleged negligence consisted of Dr. Smith, the State physician, prescribing the adminstration of Thorazine in amounts of 100 m.g. to the decedent when the Physical Desk Reference suggested 25 m.g. and where the decedent had a known history of asthma.

There are five weighty transcripts of medical testimony, one doctor testifying for Claimant and three for Respondent. The doctor testifying for Claimant tends to uphold Claimant's case while Respondent's doctors deny the negligence.

The decedent was last injected with 50 m.g. Thorazine on January 24, 1971, but his death did not occur until January 27, 1971. During those three days, decedent was conscious, alert and active and his bronchial rales actually improved by the date of his death.

Claimant's case is based largely upon the dosage prescribed by the treating physician and administered three days before his death and contends that there was sufficient negligence to cause the death of decedent.

The Physicians' Desk Reference, in dealing with the drug Thorazine, indicates that a dosage of 25 m.g. is recommended.

Pertinent parts of the medical testimony show that Dr. Smith had practiced medicine over 25 years at the time of the decedent's death and had been a physician at the Sheridan institution for over 20 years. He had prescribed Thorazine for 16 years prior to 1971 to previous patients, many of whom were asthmatics, with

no adverse reactions.

Dr. Smith had seen the deceased on at least 18 separate occasions and his testimony indicated that he was thoroughly familiar with the drug Thorazine and the patient, Anthony Jones.

The crux of the issue of negligence in this case is whether the intramuscular injections of 100 m.g. of Thorazine, in light of the general standard of care and of the recommendation of a lower dosage in the Physician's Desk Reference, constituted a breach of the duty of care. Dr. Smith testified that he had in the past given intramuscular dosages or 100 m.g. of Thorazine to other patients without any bad after effects and that this dosage was actually below those used in other psychiatric hospital.

Dr. Valentine Popa, Respondent's witness, who at that time was Chief Physician at the Asthma Clinic at Billings Hospital, testified that he had used Thorazine on asthmatic patients in the past without any bad side effects. He further testified that he did not have many agitated patients at that time and had never personally administered dosages of 100 m.g., but he stated that he was aware of other doctors who did use 100 m.g. dosages on asthmatic patients.

Respondent's other expert witness, Dr. John Davis, is a specialist in psychopharmacology as well as a teacher, lecturer, and author on the subject, and also is a Professor of Psychiatry at the University of Chicago School of Medicine and Director of Research at Illinois State Psychiatric Institute. Dr. Davis had personally conducted extensive research on the effects of Thorazine for a seven-year period while working with the National Institute of Health.

According to his testimony, the dosage used in most of those tests were 100 m.g.'s administered by intramuscular injection, the same amount as was given to decedent. Dr. Davis further stated that in his actual practice he had given dosages as high as 6,000 m.g.'s of Thorazine per day, seldom using less than 400 m.g. intramuscular dosages and that "100 m.g.'s would be the standard injection that most people would use."

The conclusion that 100 m.g.'s of Thorazine is not only a safe dosage, but a standard and common one, is supported by the testimony of three doctors — Dr. Smith, who had extensive experience with both the drug and the patient; Dr. Popa, who had considerable experience with asthmatic patients and the drug in question; and Dr. Davis, who had studied and research-ed Thorazine for seven years and whose almost over-whelming credentials manifest an uncommonly high level of expertise in the field of drug research. This conclusion was contradicted only by Dr. Farg Loutfy, an internist, who was Claimant's expert witness. In Dr. Loutfy's opinion, the usual dosage of Thorazine was 25 m.g., the same amount as that recommended in the Physicians' Desk Reference.

It is suggested that Dr. Loufty's testimony, at its best, is not of probative value. The record, pages six and seven, show Dr. Loufty's experience to have been confined entirely to the field of internal medicine. He had no special education, or practice in neurology or psychiatry. Evidence is lacking that Dr. Loufty, as a medical man, had occasion ever to prescribe or admin-ister Thorazine to a patient. Further, there is no evi-dence that Dr. Loufty had any experience in treating any patient with asthmatic symptoms complicated by the emotional distrubances and afflictions from which the decedent was suffering at the time of and just

before his death. There is no evidence, in fact, that Dr. Loufty had ever observed any patient who exhibited the symptomatology recorded in decedent's medical history. The direct examination of Dr. Loufty can be best described as an attempt to bolster, or support a very general statement in the Physicians' Desk Reference rather than to provide medical testimony of a qualified expert familiar with the use of Thorazine in treating perons afflicted with severe emotional disturbances.

The evidence indicates that the deceased had been an inmate at the Illinois State Training School on previous occasions and had had a rather troubled career. The evidence shows that at the time the dosage was administered he was in a highly agitated condition and had to be given the injection by force, that he was uncooperative threatening to cause trouble and was, on the whole, a very unsatisfactory patient.

The evidence further shows that the deceased, despite warnings by Dr. Smith and other personnel at the hospital, insisted on smoking and that he had been caught smoking cotton as well as cigarettes while he was at Sheridan, both of which were injurious to his asthmatic condition.

The propriety of administering a dosage of 100 m.g., in light of the fact that the Physicians' Desk Reference recommends a lower dosage, was characterized as a significant issue during the hearing and in Claimant's brief. Claimant cites in her brief *Ohligschlager v. Proctor Community Hospital, 55 Ill. 2d 411, 303 N.E.2d 392,* which stated that "Where a drug manufacturer recommends to the medical profession (1) the conditions under which its drug should be prescribed; (2) the disorders it is designed to relieve; (3) the precau-

tionary measures which should be observed; and (4) warns of the dangers which are inherent in its use, the doctor's deviation from such recommendation is prima facie evidence of negligence.

Dr. Loufty, Claimant's own doctor, testified that smoking could worsen an asthmatic condition. The testimonies of a nurse and guard indicated that on the date of death, burning cotton and paper were found in the room of decedent on the window ledge near his body.

Claimant bears the burden of showing by a preponderance of the evidence that the acts of the Respondent proximately caused decedent's death. It is contended by Claimant that this burden has been sustained merely by the testimony of one doctor out of four who testified and by the fact that the dosages of Thorazine given to decedent were above those recommended in an ordinary handbook written by various drug companies. To find that this meager showing constitutes a preponderance of the evidence would necessitate a total disregard for the testimony of three other doctors — Dr. Davis, an expert in the use and effects of Thorazine; Dr. Popa, an expert in the treatment of asthma; and Dr. Smith, a physician with substantial experience in the use of Thorazine, the treatment of asthma, and the personal treatment of decedent. It would also require agreement with the theory, implicit in Claimant's argument, that proximate cause is established by the mere fact of a deviation from the manufacturer's recommendations on drug dosage. A scrutiny of the record indicates not only that the dosage of Thorazine was not the proximate cause of death, but that it was not even the cause in fact.

The essence of Dr. Loutfy's opinion was that Thorazine is a general nervous system depressant; that this

causes a depression of the respiratory system along with the depression of other functions; and that 100 m.g. was too high a dosage, causing a respiratory failure. This opinion was contradicted by several points made by the other three doctors, the consensus being that the dosages of Thorazine given to decedent three days prior to his death could not have been and was not, in fact, the cause of death.

Dr. Smith testified that the use of Thorazine in a patient with the type of asthma which the decedent had would operate to prevent the anxiety and tension that triggers attacks, rather than to aggravate the condition. Dr. Loutfy, Claimant's witness, agreed that these attacks are caused by emotional stress and that it would be desirable to try to decrease the possibility of an attack.

Dr. Loutfy stated that Thorazine can cause a state of respiratory depression, but Dr. Popa testified that if the Thorazine caused this condition, it would have done so immediately rather than three days later. He added that a person who was in a state of respiratory depression would be comatose. The decedent was last injected with 50 m.g. of Thorazine on January 24, 1971, but his death did not occur until January 27, 1971. During those three days, the decedent was conscious, alert and active, and his bronchial rales had actually improved by January 27, 1971.

Dr. Davis testified that, contrary to Dr. Loutfy's opinion, central nervous system depression and respiratory depression are not necessarily coexistent, indicating that while the decedent's central nervous system may have been depressed by the Thorazine, his respiratory system would not, a fortiori, be depressed as well. The theory that Thorazine caused respiratory

depression was discredited even further by Dr. Davis' opinion that Thorazine can also act as a respiratory stimulant and that it, in fact, stimulates respiration in overdose. Thus, even if Claimant's allegation that there was and overdose of Thorazine is correct, it would have stimulated rather than depressed the decedent's respiration.

The strongest evidence showing that the Thorazine injections did not cause the decedent's death lies in the fact that even if Thorazine was capable of causing death by respiratory depression or otherwise, its effects would have worn off between the time of the last dosage and the time of death. The last dosage was 50 m.g. given on January 24, 1971, and the time of the fatal asthma attack was at approximately 7:45 p.m. on January 27, 1971, an interim period of about 66 hours. Dr. Smith testified that Thorazine wears off in approximately 24 hours and Dr. Popa stated that it would have been almost totally excreted in two days' time. Dr. Davis substantially concurred with this view, declaring that the peak activity of Thorazine occurs in six hours or less, that 50 percent of it disappears in 24 hours and that it would have been almost entirely metabolized by the time of death in this case. Even Dr. Loutfy admitted that the effects would only last for 12 to 18 hours. The weight of this evidence negates any possibility that Thorazine could affect bodily functions in any way 66 hours after it was last taken.

Finally, in light of all this evidence, the consensus of opinion was that Thorazine was not and could not have been the cause of death. Dr. Smith stated this and Dr. Davis agreed, adding that Thorazine, in his opinion, has never been the cause of any death in any quantity. Dr. Popa maintained that there was no connection whatsoever between the Thorazine and the

decedent's death, that Thorazine does not cause asthmatic attacks, and that there was also no connection between the injections of Thorazine and the worsening of the asthmatic condition. This last point was made also by Dr. Davis.

Dr. Smith, Dr. Popa and Dr. Loutfy all testified that asthmatic attacks are sudden, unpredictable and sometimes fatal. In the decedent's case, these attacks were brought on by emotional upset, and in light of the fact that the evidence indicates that he was agitated at 1:15 p.m. on January 27, 1971, several hours prior to his death, it appears that his fatal attack was brought on by his own activity. Thus, the decedent's own obstreperous and turbulent state of mind was the instrument of his demise, rather than the Thorazine which, if anything, forestalled the fatal attack.

An autopsy was performed on decedent and the coroner's report showed that he died of acute cardiorespiratory failure due to status asthmaticus and also showed signs of pulmonary emphysema and right heart enlargement.

The records show that the three doctors testifying for Respondent were specialists in this field and had broad experience, much greater than that of the single medical expert who testified on behalf of Claimant.

It is not necessary to comment on the lack of evidence supporting the claim for damages alleged by Claimant.

Claimant's brief correctly cites authority for the proposition that, in Illinois, there is a presumption of some substantial pecuniary loss to a parent as a result of a child's death. It is, however, only a presumption and is not conclusive proof that damages exist.

The testimony in the record indicates that outside of decedent's early childhood, most of his life was spent living away from home. He spent the last three years of grade school in Maryville Academy, having been sent to live there by a Court Order. When he was approximately 14 years old, he moved out of his mother's home and went to live with his sister for about six months. Thereafter, he was committed to the Illinois Youth Commission upon conviction for rape, deviate sex conduct and aggravated assault. A month later, he was transferred to the Illinois State Training School for Boys where he was paroled on June 10, 1967. About three months later, he was returned from parole for fighting with his mother. He was again paroled on November 21, 1967 but was returned in less than a month for three counts of assault. From that period to his death in 1971, the decedent remained away from home under state supervision.

The decedent's mother testified that her son worked in a restaurant and gave her a portion of his salary. She could not, however, recall the date of his employment or his age at the time. At the very best, the arrangement could not have lasted very long considering the fact that decedent had spent the last several years preceding his death away from home.

It is the opinion of this Court that Claimant has failed to prove (1) that the State was negligent; (2) or that the State caused the death of decedent; and (3) that Claimant was free from contributory negligence.

This claim is denied.