BETTY WITHERELL, Plaintiff-Appellee and Cross-Appellant, v. JAMES I. WEIMER *et al.*, Defendants-Appellants and Cross-Appellee.

Third District No. 3—84—0759

Opinion filed July 17, 1986.—Rehearing denied October 23, 1986.

BARRY, J., dissenting.

Roger R. Clayton, Karen L. Kendall, David R. Sinn, and Lyle W. Allen, all of Heyl, Royster, Voelker & Allen, of Peoria, for appellants.

James L. Hafele, of Peoria, and Thomas H. Bleakley, of Detroit, Michigan, for appellee.

JUSTICE WOMBACHER delivered the opinion of the court:

Defendants, J. I. Weimer, M.D., and R. K. Taubert, M.D., appeal the jury verdict against them in the amount of $300,000. They cite numerous alleged errors at trial. Plaintiff, Betty Witherell, appeals the trial court's reduction of her award on the basis of comparative fault. The trial court also held section 2—1205 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1205) to be unconstitutional. We reverse.

This is the second appeal in this case. The prior appeal concerned the circuit court's grant of the defendant doctors' motion to dismiss. This court reversed, and the supreme court affirmed. (*Witherell v. Weimer* (1979), 77 Ill. App. 3d 582, 396 N.E.2d 268, *aff'd* (1981), 85 Ill. 2d 146, 421 N.E.2d 869.) Upon remand, a jury trial was held. The jury found in favor of the plaintiff and awarded her $500,000 in damages. The jury also apportioned 40% of the damages to her own negligence, thus reducing the award to $300,000.

The first issue we shall deal with concerns the application of the statute of limitations to the present case. Among other contentions, defendants claim that a bifurcated hearing on the issue should have been held, and that the jury erred in its findings. We find, however, that we are precluded from addressing these issues, as they are barred

due to *res judicata*. The supreme court decided the issue in one concise statement. "In our opinion, generally accepted principles of equitable estoppel prevent the defendant doctors from urging the limitations bar." (*Witherell v. Weimer* (1981), 85 Ill. 2d 146, 158, 421 N.E.2d 869.) The court further stated that "fundamental fairness require[s] that the defendant doctors be held estopped by their conduct from now arguing that plaintiff should have sooner complained against them for a condition they repeatedly assured her she did not have." 85 Ill. 2d 146, 160, 421 N.E.2d 869.

■ It is readily apparent that the supreme court, by the two above quoted sentences, decided, as a matter of law, the statute of limitations would not act as a bar in this case. Defendants claim that the fact, adduced after the supreme court decision, that plaintiff's husband had a vasectomy in the early 1970's should change the decision. We see no connection between the vasectomy and the defendant's conduct. The supreme court's holding was quite clear and unambiguous. "A question of law decided on a previous appeal is binding on both the trial court and the appellate court." (*Gord Industrial Plastics, Inc. v. Aubrey Manufacturing, Inc.* (1984), 127 Ill. App. 3d 589, 591, 469 N.E.2d 389.) Both parties inexplicably spent a great portion of their argument, both oral and written, on this issue. We find that the supreme court disposed of the question in one simple sentence! It is *res judicata.*

■ The second issue deals with a constitutional question. The trial judge held section 2—1205 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1205) to be unconstitutional as arbitrary and specific legislation. As such, it would be violative of the Constitution of 1970 (Ill. Const. 1970, art. IV, sec. 13.) Having found the statute to be infirm, the court denied defendants' request for a setoff. Defendants also challenge this ruling.

Section 2—1205 allows a reduction of up to 50% of the amount of recovery for unsubrogated reimbursements for medical charges, hospital charges, etc. This section was enacted in response to the medical malpractice "crisis" of 1976. Guidance for our analysis is found in *Anderson v. Wagner* (1979), 79 Ill. 2d 295, 402 N.E.2d 570, a case which upheld the constitutionality of the repose provision in the statute of limitations enacted with the section presently under scrutiny. *Cf. Mega v. Holy Cross Hospital* (1986), 111 Ill. 2d 416.

The analysis of a claim of special legislation is similar to that of an equal protection claim. The legislature may regulate persons or objects in a class if there is a reasonable basis for doing so. (*Anderson v. Wagner* (1979), 79 Ill. 2d 295, 315, 402 N.E.2d 570.) In *Anderson*, the court found a reasonable basis to distinguish between physicians and hospitals and the general class of health-care providers. The statute was

drawn narrowly to apply to those most affected by the malpractice explosion that existed. 79 Ill. 2d 295, 319, 402 N.E.2d 570.

The object of the legislation was to insure the continued availability of malpractice insurance to those who were affected by the multitude of claims and thus to insure the continuation of health services from those affected groups. (*Anderson v. Wagner* (1979), 79 Ill. 2d 295, 317, 402 N.E.2d 570.) Likewise, the obvious intention of section 2—1205 is to prohibit a double recovery of damages. Those who are injured and reimbursed, and will not recover twice for their reimbursed expenses, may be less likely to bring suit against their physician. With fewer suits and fewer double recoveries, malpractice premiums are not forced to increase, thus achieving the goal of the legislature, *i.e.*, keeping malpractice insurance available to all practitioners.

The trial court relied primarily on *Wright v. Central Du Page Hospital* (1976), 63 Ill. 2d 313, 347 N.E.2d 736. The holding in *Wright* is clearly distinguishable from the present case. The *Anderson* court noted that *Wright* disapproved of the act because it would have been possible for the seriously injured to be unable to recover all medical expenses because of the $500,000 limit on recovery in malpractice cases. *Anderson v. Wagner* (1979), 79 Ill. 2d 295, 304-05, 402 N.E.2d 570.

In the present section, we have no such limit on the recovery of damages. The section does not hinder a plaintiff's right to a full recovery for his damages. It merely limits his recovery to those items for which he was not reimbursed. The section is thus a reasonable method of the legislature's attempt to attain its goal. For this reason, we must reverse the trial court's holding that section 2—1205 is unconstitutional.

■ The third and decisive issue concerns the cross-appeal. Plaintiff has cross-appealed the trial court's acceptance of the verdict in regard to the question of comparative fault. Plaintiff claims that defendants did not generally or specifically plead and prove allegations of contributory negligence. The trial court noted that defendants had no duty to plead these allegations. The trial court also refused to place the burden of proof as to any contributory negligence upon defendants. The trial judge subsequently allowed the jury's determination of the plaintiff's negligence to stand.

The supreme court recently passed on the burden-of-proof issue in *Casey v. Baseden* (1986), 111 Ill. 2d 341. *Casey* found that plaintiffs were no longer obligated to plead and prove their freedom from contributory negligence. Thus, the burden of proving a plaintiff's negligence was placed on defendants and the instruction given in *Casey*, placing the burden on the defendant, was proper. The court reasoned

that comparative negligence is similar to a plaintiff's duty to mitigate his damages. Since a defendant must prove a plaintiff's failure to mitigate damages, a defendant "should likewise carry the burden on the plaintiff's negligence." 111 Ill. 2d 341, 347.

In the present case, the court refused to put the burden on the defendants. An instruction should have been given, however. At most, defendants were entitled to only a general instruction on comparative negligence. Thus, reversal is required. However, given the amount of fault assessed to the plaintiff, and the evidence supporting such an assessment, we are unwilling to simply reverse the finding of comparative fault. Equity dictates the case be remanded to give defendants the opportunity to prove the alleged negligence on plaintiff's part, and the jury must make its decision from defendants' proofs.

■ Plaintiff also contends that it was error for the court to allow the jury to consider plaintiff's negligence as it was not put forth in the pleadings. We disagree. At the time of trial, defendants were not required to plead allegations of contributory negligence. Public Act 84—624 amended section 2—613(d) of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—613(d)) (effective September 20, 1985) to require that plaintiffs' negligence must be treated as an affirmative defense. As there was then no burden upon defendants to plead the negligence at the time of trial, there was no error for the court to allow its presentation.

We have analyzed above the purely legal issues in this cause and must now turn to applying the law to the factual issues involved in the trial of this case.

Plaintiff's medical history is involved and complex. In 1965, she complained of frequent episodes of hot flashes. She had a prior history of menstrual problems. In order to remedy this, defendant Dr. Weimer injected her with estrogen. She was also placed on a prescription of Ortho-Novum, a birth-control medication. Plaintiff continually saw defendant, reporting a variety of symptoms. Aside from the hot flashes, in 1965 she also suffered from pain in the knee and the neck. In 1966, she suffered pain in the throat and neck. In March 1967, she had her first attack of thrombophlebitis. Dr. Weimer felt that this was caused by a combination of the trauma she suffered in a beating by her husband and by a fall down some stairs.

Also in 1967, plaintiff attempted suicide. In 1969, plaintiff had an ovarian deficiency and chest pains. Between October 1966 and June 1969, when she suffered the ovarian deficiency, plaintiff received no estrogen injections from either Dr. Weimer or Dr. Taubert. In 1970, Dr. Taubert refilled her prescription. Dr. Weimer also administered estrogen injections in September and November 1970. Injections were also

administered in February, July, August, October, and December of 1971.

Plaintiff was twice hospitalized in 1971, complaining of thrombophlebitic symptoms. She was attended to by Dr. Ehmke, a neurologist, and Dr. Remolina. Dr. Ehmke found that plaintiff did not have thrombophlebitis, her problems were nonvascular, and that they were probably psychophysiological. Dr. Remolina, during the second hospitalization, found that she suffered a musculoskeletal reaction. Dr. Remolina also recommended outpatient psychiatric therapy.

Plaintiff had another bout with thrombophlebitis in 1972. She was hospitalized after a long auto trip. Dr. Taubert admitted her to Pekin Hospital, diagnosing thrombophlebitis caused by stasis. The condition resolved itself in six to eight days.

Plaintiff's next leg pain occurred in May 1973 following an auto accident. In May, she also required outpatient treatment for hip, lower back, and neck pain. Plaintiff additionally received acupuncture treatment. In September 1973 plaintiff was treated for leg pain by defendants' deceased partner, Dr. Rhoades. He diagnosed sciatica and recommended diathermic treatment. Also in September, Dr. Weimer prescribed cyclospasmal for plaintiff's poor circulation.

In April 1974 plaintiff saw psychiatrist Dr. Turow complaining of spasms and occipitalfrontal headaches. Turow found plaintiff to be preoccupied with physical problems. In May plaintiff complained of spasms and weakness in the shoulders and legs that were so bad that she could not work.

Plaintiff saw Dr. Taubert in March 1976 about a sore throat and chest pains. She was hospitalized that May with neuritis and myostisis. However, she complained of recurrent phlebitic symptoms. Dr. Weimer examined her for this, but he found no evidence of phlebitis, only tenderness. Dr. Clements, a resident in cardiology, also examined plaintiff during the hospitalization. He also found swelling in the leg, diagnosing it as caused by the electric-shock therapy to the leg administered by a chiropractor nine weeks before the hospitalization. Dr. Wright, a radiologist, examined a venogram of plaintiff's leg. His analysis was that that clots in plaintiff's leg were old and had recannalized. A possible cause of this was one prior episode of thrombophlebitis.

Plaintiff never saw defendants after this. She filed this action January 4, 1978.

In May 1976 plaintiff was examined by Dr. Juco. He diagnosed active thrombophlebitis. In January 1977 Dr. Juco referred plaintiff to the Mayo Clinic. The examination revealed post-phlebitic syndrome. From March 1977 through March 1980 plaintiff saw Dr. Camacho, an internist. He found no evidence of active thrombophlebitis. He also

thought that there might not be any organic cause to her problems. During that period, plaintiff also saw Dr. Beck, a psychiatrist, for treatment of anxiety and depression.

After seeing Dr. Camacho, plaintiff began seeing Dr. Cullinan, who was her treating physician up to the time of trial. Dr. Cullinan had plaintiff on an anticoagulation therapy of Coumadin. Her first leg problem while under his care arose in February 1982. Plaintiff took a 10-day trip by car to Florida. Her right leg was swollen, and she was admitted to the hospital. Dr. Cullinan found deep-vein thrombophlebitis and a possible pulmonary embolus. She was rehospitalized in September, but all tests on her legs proved normal.

In December 1982 plaintiff was in Champaign. She saw Dr. Houston, a hematologist, complaining of chest pain. Dr. Houston found plaintiff's legs to be normal. No evidence of circulatory disease was found. Dr. Houston felt that plaintiff was psychologically dependent on her medications.

Plaintiff then saw Dr. Cullinan and Dr. Shay, a cardiologist, in December 1982 and January 1983. They found no evidence of active disease. In July 1983 plaintiff was again hospitalized, complaining of low back pain and of coughing up blood. Dr. Arthur Fox, a pulmonary disease specialist, found no evidence of pulmonary emboli. Dr. James R. DeBord, a vascular surgeon, found that blood flow in and out of her legs to be normal.

Another hospitalization occurred in August 1983. Dr. DeBord again found the blood flow to be normal. Dr. Duane Morgan, a pulmonary disease specialist, found no thrombosis nor venal insufficiency, and recommended stopping the anticoagulation therapy.

Plaintiff complained of chest pain and abdominal pain in December 1983 and was again hospitalized. Dr. Radic, a cardiologist, found no heart disease. Dr. Russo, a physical medical specialist, thought her problems to be the result of mechanical factors and arthritis. Dr. De-Bord found normal blood flow. This was the last hospitalization before trial.

It is quite clear from the record that the central issue relied on in plaintiff's case was the relationship between the thrombophlebitis and the combination of estrogen and Ortho-Novum. Plaintiff's contention is that the dispensing of the medications either caused or aggravated the thrombophlebitic episodes, and that it was negligent to continue their prescription. There was a great deal of evidence from both sides as to this issue.

■ However, we believe that the jury was improperly instructed on this issue. It is well settled that, in reviewing the instructions submitted to the jury, they should be viewed as a whole. (*Curry v. Sum-*

*mer* (1985), 136 Ill. App. 3d 468, 483 N.E.2d 711.) The issues instruction set forth plaintiff's allegations as follows:

"The plaintiff claims that she was injured and sustained damage, and that the defendants were negligent in one or more of the following respects:

a. Did not properly interpret, diagnose and treat the signs and symptoms of the plaintiff's condition of thrombophlebitis in April and May of 1976.

b. Did not timely recognize the presence of thrombophlebitis in plaintiff's legs in April and May of 1976.

c. Failed to prescribe drugs which were appropriate for the plaintiff, given her condition.

d. Continued to allow her to take birth control pills and estrogen notwithstanding that they knew that the plaintiff had thrombophlebitis or a past history of thrombophlebitis."

The instructions then required the jury to find for the plaintiff if she proved any of the above allegations.

Nowhere is the jury required to make a finding that the prescription of estrogen and birth-control pills were the proximate cause of her injury or that her problems were aggravated by the medication. Defendants' position was that, while she did suffer from episodes of thrombophlebitis, and while defendants continued the birth-control pill/estrogen therapy, the medications had no injurious effect. Without requiring the jury to make a finding of causation, defendants' position is an admission of liability under the above-stated issues. We therefore find this instruction unacceptable and improper.

■ We make this analysis under Supreme Court Rule 366 (87 Ill. 2d R. 366) which provides in pertinent part: "(a) Powers. In all appeals the reviewing court may, in its discretion, and on such terms it deems just *** (5) *** grant any relief *** that the cause may require." (87 Ill. 2d R. 366(a)(5).) This rule has been held analogous to the plain-error doctrine in criminal review. (*Schutzenhofer v. Granite City Steel Co.* (1982), 93 Ill. 2d 208, 211, 443 N.E.2d 563.) We find that the issues instruction, if followed literally, deprives defendants of having their defense as to causation considered by the jury. The instructions, taken as a whole, do not cure this problem. As this discussion makes clear, we believe we have the right to exercise our discretion, analyze the issue, and decide the same even though neither of the parties to this appeal made an appropriate objection to the issues instruction. This issue, while not in and of itself dispositive of our decision, further supports the outcome, *i.e.*, reversal and remandment, dictated by the legal holdings discussed above.

Because of our decision today, we decline to review all of defend-

ants' other alleged errors. We shall examine those which are likely to recur on remand. The first concerns the use of the Physicians' Desk Reference (PDR) in the trial. Defendants claim that the PDR was used to establish the standard of care through Dr. Laird, plaintiff's pharmacological expert.

■ Defendants first claim that Dr. Laird was incompetent to establish standard-of-care testimony. This is based on the fact that Dr. Laird is not licensed to practice medicine in any State. This, defendants claim, renders him incompetent as a medical expert witness under the holding of *Dolan v. Galluzzo* (1979), 77 Ill. 2d 279, 396 N.E.2d 13. *Dolan* held that for an expert to testify, the expert must be licensed in the *school of medicine* in which (as hereinafter explained) the defendants belong.

Dr. Laird testified to his credentials. He received his M.D. in 1949 from Wayne State University School of Medicine. He served an internship at Detroit Receiving Hospital. He then received his master's degree in Pharmacology in 1952 from Wayne State. He received his Doctorate in Pharmacology from the University of Michigan Medical School. He also taught pharmacology to medical students during that time, achieving the rank of assistant professor.

Dr. Laird served in the military in 1955 and 1956, practicing in the army in Kentucky for those years. He is now in the reserve corps, as an M.D. He additionally has worked for Sherman Laboratories and Parke Davis & Co. While at both jobs, he performed research, prepared data for the PDR, and was a part-time pharmacology professor. After leaving Parke Davis, Dr. Laird joined the full-time faculty at Wayne State, teaching pharmacology.

We find that given his experience, Dr. Laird was qualified to testify as to the pharmacological aspects of the present case. However, defendants point out that his testimony pertained to following the recommendations in the PDR. We find no error in the circumstance, based on the witness' experience.

The rule in *Dolan* was explained in *Bartimus v. Paxton Community Hospital* (1983), 120 Ill. App. 3d 1060, 458 N.E.2d 1072. The rule was created to protect professionals licensed in one "school of medicine" from having their actions judged by one licensed in another "school of medicine." Thus, in *Dolan,* an orthopedic surgeon was prevented from evaluating work of a podiatrist, as each is licensed under separate acts of this State. In *Bartimus,* an allopath, licensed under the same statute as the defendant osteopath, could testify as to standard of care testimony.

Dr. Laird's testimony is not in violation of the rule of *Dolan.* Dr. Laird received an M.D., he had extensive practical and theoretical

knowledge of pharmacology, and his teaching has prepared many medical students, presumably doctors now, for practice. He has also had practical experience as a physician, having practiced, and continuing to serve, in the army. Additionally, Dr. Laird did not evaluate the work of defendants.

For these reasons, defendants were not prejudiced by Dr. Laird's pharmacological testimony. He was taught and teaches in the same school of medicine. His practical knowledge was gained under similar circumstances. Thus, the testimony of Dr. Laird was properly allowed.

■ Defendants next argue that plaintiff used the PDR to establish the standard of care. Our examination of the evidence reveals that this is not so. Dr. Laird stated that, since 1948, the PDR sets a guide by which physicians should guide their conduct in the use of medications. He then stated that prescribing estrogens to someone with a history of thrombophlebitis between 1968 and 1976 violated the standards in the PDR and was not in accord with prescribing medical literature. Dr. Laird's testimony was that prescribing medications when faced with contraindications should not be done.

Plaintiff then established that following the recommendations in the PDR was the standard of care. They did so through the testimony of their other expert witness, Dr. Immesoete. The use of the PDR to establish *prima facie* evidence of negligence was approved in *Ohligschlager v. Proctor Community Hospital* (1973), 55 Ill. 2d 411, 303 N.E.2d 392. This is contrary to the general rule that the standard of care must be proved by expert testimony. In the present case, plaintiffs used the PDR to establish *a* standard of care. Dr. Immesoete then showed that, in defendant's locale, the standard of care was that the PDR should be followed. Thus, plaintiff did use expert testimony to establish the standard of care.

The present case is distinguishable from a case heavily relied upon by defendants, *Young v. Cerniak* (1984), 126 Ill. App. 3d 952, 467 N.E.2d 1045. In *Young*, there was no evidence that following the recommendations of the PDR was the standard of care. Rather, the evidence showed that the PDR was merely a guide. In the instant case, Dr. Immesoete stated that there should be no deviation from the PDR. Thus, its use was not erroneous.

For the foregoing reasons, the judgment of the circuit court of Tazewell County is reversed. The cause is remanded for a new trial.

Reversed and remanded.

SCOTT, J., concurs.

JUSTICE BARRY, dissenting:

I dissent from the majority opinion; I would affirm the verdict of the jury in this case subject to a modification of the judgment by allowing a setoff for certain reimbursements.

Considering the complexity of this appeal, it may be helpful to state at the outset that I agree with the majority that section 2—1205 of the Code of Civil Procedure is constitutional, that Dr. Laird was qualified to testify as to pharmacological aspects of the case, and that it was not error to receive evidence of plaintiff's negligence without special pleading of such an affirmative defense by defendants.

As to the estoppel issue, although I join with the majority in holding that defendants are estopped from asserting the statute of limitations as an affirmative defense, I do not agree that this issue was previously determined by the Supreme Court of Illinois in *Witherell v. Weimer* (1981), 85 Ill. 2d 146, 421 N.E.2d 869. The majority has quoted two statements from the supreme court decision out of context. As I read that decision, the court held that plaintiff had *alleged* circumstances that, *if proved*, would estop the doctors from asserting the statute of limitations as an affirmative defense. The court stated: "She [plaintiff] is, in our judgment, entitled to an opportunity to prove the allegations upon which the estoppel and her cause of action are based." (85 Ill. 2d 146, 160, 421 N.E.2d 869, 876.) Pursuant to that holding of the supreme court, upon remand the issue of estoppel was tried and was submitted to the jury along with the other issues in this case, and the jury's determination of that issue is subject to review on appeal.

The evidence was disputed as to when plaintiff knew or reasonably should have known that her injury resulted from actionable conduct by defendant doctors. Defendants argue on appeal that the verdict holding the doctors estopped from asserting the statute of limitations was contrary to the manifest weight of the evidence. I believe the evidence indicating that plaintiff relied upon defendants' representations that her leg problems were not connected to the estrogen and birth-control medication, though not unanimous, was sufficient to support the verdict. The testimony that plaintiff's husband obtained a vasectomy in 1974 so that plaintiff would no longer have to take birth-control medication and that plaintiff at that time appreciated the causal relationship between the pill and her leg condition was not so clear and convincing that all the testimony to the contrary would have to be disbelieved. Therefore, I would hold that the jury's finding of estoppel was not contrary to the manifest weight of the evidence.

The majority opinion states that the decisive issue is plaintiff's cross-appeal from the verdict and judgment assessing 40% of the fault to her negligence. The majority holds that the court committed revers-

ible error in failing to give a burden-of-proof instruction placing the burden of proving plaintiff's negligence on defendant. Examination of the record discloses the court in fact *gave* plaintiff's burden-of-proof instruction (Plaintiff's instruction No. 19, Illinois Pattern Jury Instruction, Civil, No. 21.03 (2d ed. 1971)) and refused defendant's. Neither party offered an instruction placing the burden of proving plaintiff's negligence on defendant, and plaintiff made no such argument in her cross-appeal. Thus, any error was waived. Even if plaintiff had offered such an instruction, in my view the failure to give it would not have been reversible error. The decision of *Casey v. Baseden* relied upon by the majority had not been decided by the supreme court at the time of the trial in this cause, and the statute requiring that plaintiff's negligence be treated as an affirmative defense had not been enacted. If such procedural changes in the rapidly evolving law of comparative negligence are given retroactive effect, this plaintiff and others similarly situated may never be able to have a trial that meets the requirements of not only the present but future legal standards.

Defendants have argued that the court erred in giving the burden-of-proof instruction offered by plaintiff rather than the instruction submitted by defendants. Defendants claim that their instruction was a statement of the law of comparative negligence relating to the diminution of damages. However, there is no such language in the burden-of-proof instruction offered by defendants. The court did instruct the jury that defendants claim that plaintiff was contributorily negligent in one or more of seven specific actions, and it gave the jury a verdict form based in IPI Civil 2d No. 45.01 which set forth the method of reducing the total damages by the amount of any negligence attributable to plaintiff. Under the law in existence at the time of trial, I would hold these instructions to be adequate. Furthermore, the jury did in fact find that 40% of plaintiff's injuries were attributable to plaintiff's negligence. Given that finding, I would not consider any error in the burden-of-proof instruction to have been reversible error.

The majority also bases its reversal on the fact that the issues instruction did not include a statement that the jury must find that the drugs prescribed by the defendants were the cause of plaintiff's thrombophlebitis. In my view, any such error was waived because neither party offered an instruction containing such a statement, and neither party has argued such error in either the trial court or the appellate court. I am aware of no cases holding that a reviewing court can reverse a civil judgment for an error in an instruction which neither party has raised at any stage of the litigation. The *Schutzenhofer* case relied upon by the majority involved an improper summary judgment which decided an issue of fact—a far cry from the situation here. The

burden of asserting error is on the parties, not the court, and I am firmly opposed to a policy whereby the reviewing court searches the record for errors not claimed by either party.

In addition, I see nothing wrong with the instruction on causation as given. The majority has quoted from a small portion of the issues instruction, and has omitted that part of the instruction which covered causation. After listing the alleged acts of negligence claimed by plaintiff, the instruction stated:

> "The plaintiff further claims that one or more of the foregoing was a proximate cause of her injuries.
>
> The defendants deny that they were negligent in doing any of the things claimed by the plaintiff and deny that any claimed act or omission on the part of these defendants was a proximate cause of the plaintiff's claimed injuries."

This instruction makes clear that the jury must find that the proximate cause of plaintiff's injuries was either the defendants' failure to diagnose and treat plaintiff's thrombophlebitis properly or the giving of inappropriate medications. I believe this instruction was fully adequate as to causation. Furthermore, as I view this case, to require a specific finding that certain prescriptions were the proximate cause of plaintiff's injury would not be appropriate because the evidence indicates that other acts of the defendants may have amounted to negligence as well as the disputed prescriptions. The majority's view of causation is unjustifiably narrow in the context of this case.

Since I do not agree that these instructions to the jury constituted reversible error, it is also necessary to consider the other errors asserted by defendants.

Foremost among the additional issues are the defendants' contentions that the jury finding defendants liable and the finding of proximate causation were both against the manifest weight of the evidence. These issues were hotly contested, and numerous medical witnesses testified for each side. There was substantial evidence in support of the jury's verdict. For example, plaintiff was examined by Dr. Juco, a cardiovascular surgeon, in May of 1976 and was diagnosed as having active thrombophlebitis in the deep veins of both legs. Dr. Juco made the diagnosis after ordering a venogram and discovering several clots in each leg. He stated that "most of the deep [vein] system below the groin has been involved in previous thrombophlebitis." He stopped the birth-control medication and prescribed Coumadin as anticoagulant therapy. This was just a few days after defendant Weimer had diagnosed plaintiff's leg pains as due to neuritis and myositis, not phlebitis, and had prescribed pain pills plus walking.

In January of 1977, when plaintiff again complained of leg and

chest pains, Dr. Juco referred plaintiff to Mayo Clinic for a second opinion. As a result of that consultation, the diagnosis was post-phlebitic syndrome with no active phlebitis in her legs at that time. Post-phlebitic syndrome involves swelling and pain in the legs as a result of the destruction of valves in the veins caused by an earlier episode of phlebitis. In order to facilitate the drainage of blood from the legs, the patient must wear elastic stockings and keep her legs elevated.

This testimony, as well as other evidence, would support a finding that defendants failed to diagnose plaintiff's condition correctly in May of 1976 and further that they failed to treat her active thrombosis appropriately at that time. As indicated in the majority opinion, defendants' conduct in 1976 was involved in two of the alleged acts of negligence set out in the issues instruction.

Although defendants' testimony indicated that plaintiff received estrogen injections in their office prior to 1972 and that she was given one prescription in 1972, good for only 6 to 12 months, for home injections, plaintiff testified that she obtained refills of the medication and of the syringes and needles for prescribed weekly injections of estrogen from 1972 to 1976. The records of the drug store corroborated plaintiff's testimony, and the druggist stated that all medications and syringes were dispensed upon written or oral prescriptions of defendants. The apparent conflict between plaintiff's testimony and that of defendants concerning the amount of estrogen prescribed was for the jury to resolve. Similarly, the dispute among the medical witnesses as to whether estrogen and birth-control pills should have been continued, given plaintiff's history of phlebitis, was another issue for the jury. Given the conflicting evidence, I would hold that the findings of the jury as to proximate cause and as to liability were not contrary to the manifest weight of the evidence.

Defendants also contend that the award of $500,000 damages was against the manifest weight of the evidence. Seeing no need to summarize here the evidence of damages, I would state that the award appears to be within the limits of fair and reasonable compensation and is not so large as to shock the judicial conscience. (*Lapidus v. Hahn* (1983), 115 Ill. App. 3d 795, 450 N.E.2d 824.) I would not set aside the verdict or the judgment as reduced.

Defendants also argue that the trial court erred in denying a motion for a bifurcated hearing which would have permitted the question of estoppel to be tried separately from the question of liability and in refusing to grant leave for an interlocutory appeal from that ruling. I am of the opinion that the trial court acted properly to prevent needless duplication of testimony since much of the evidence relating to estoppel was also the basis for establishing defendants' negligence.

Defendants do not establish prejudice from that ruling, and I would not consider the refusal of an interlocutory appeal to be an abuse of discretion.

Defendants also assert that they were deprived of a fair trial by erroneous rulings on evidence as follows:

(1) refusal to ask certain questions on *voir dire* that would have uncovered possible bias or partiality of the jurors or that would disclose prior married names of plaintiff;

(2) permitting plaintiff's counsel to draw graphs, charts and lists on a blackboard to demonstrate certain aspects of testimony;

(3) allowing plaintiff's experts to testify that the Physician's Desk Reference provided guidance for the standard of care to be used in prescribing oral contraceptives to a person with thrombophlebitis;

(4) refusing to permit a hypothetical question concerning standard of medical care acceptable in Pekin in 1963-1976;

(5) denying a motion to bar testimony by an undisclosed expert witness called by plaintiff in rebuttal to counter testimony for defendants by plaintiff's treating physician;

(6) permitting plaintiff's expert to testify concerning her subjective statements and her credibility;

(7) ordering defense counsel not to discuss this case with defendants during recesses in trial while defendants were testifying, a restriction that applied to plaintiff as well;

(8) denying defense counsel re-cross-examination of defendant Dr. Taubert during his testimony as an adverse witness for plaintiff;

(9) reading two answers to interrogatories of Dr. Weimer at the conclusion of plaintiff's rebuttal evidence, the substance of which concerned methods of ordering prescriptions for patients;

10) allowing a witness of defendants to testify to matters on cross-examination which were outside the scope of direct examination;

(11) refusing to allow defense counsel to ask plaintiff's treating hematologist whether there was a medical controversy as to estrogen causing blood clots;

(12) allowing one of plaintiff's medical witnesses to give an opinion as to causation of plaintiff's blood clots when he was not an expert in that field;

(13) receiving certain medical records into evidence allegedly without a proper foundation;

(14) admitting into evidence certain medical articles mentioned in expert testimony but without any other foundation;

(15) admitting defendant's bill for treatment of plaintiff and allowing plaintiff's counsel to malign defense counsel for withholding the document improperly.

All of these rulings concerned matters within the discretion of the trial court. I believe defendants have failed to demonstrate that the trial court abused its discretion to any substantial extent or that they were denied a fair trial by the trial court's rulings on evidence.

Defendants also contend that the court committed 12 errors in instructing the jury in that it was error to give plaintiff's Nos. 10A, 16, 19, 12, 11, 18, 17, and that it was error to refuse defendants' Nos. 17, 5, 12, 19, and 20. It would unduly lengthen this dissenting opinion to discuss defendants' arguments as to each claimed error in the instructions. In my view, defendants' positions are either without merit or amount to such a minor matter as to not constitute reversible error. In addition, defendants assert that it was error to fail to require an itemized form of verdict. This objection was waived since defendant did not offer an itemized verdict form.

In her cross-appeal, plaintiff contends that it was error to instruct the jury as to seven alleged acts of negligence on the part of plaintiff which defendants claimed contributed to her injuries. Plaintiff argues that her contributory negligence was not pleaded by defendants and that she had no opportunity to present evidence on those issues since she had no advance notice of them until the instruction conference after the proofs were closed. As I have indicated above, I do not consider the issues instruction to have been erroneous as a matter of law, and also I am convinced that it conformed to the evidence presented at trial. There was evidence indicating that plaintiff did not report all her leg pains to defendants, that she obtained refills of prescriptions without approval of defendants, that she did not follow all the instructions of defendants, and that she took long automobile trips with periods of stasis in spite of warnings by defendants. Thus, it was proper to include those actions in the instruction. The jury had to consider the evidence of both parties on those issues, as it did on all the other issues, and I believe this was an appropriate means of instructing the jury at the time of this trial.

As I have indicated above, I would affirm the verdict of the jury and modify the judgment of the trial court so as to allow a setoff for medical expenses paid by others.

### Dissenting Opinion Upon Denial Of Rehearing

JUSTICE BARRY, dissenting:

I am compelled to dissent from the majority decision to deny plaintiff's petition for rehearing. I believe plaintiff's arguments for rehearing have sufficient merit to be given full consideration by this court. Although plaintiff's petition is entitled "Petition for Rehearing," she is

actually seeking a *first* hearing on review of the issue which the majority found determinative in this case.

Plaintiff's assertions include that the majority has misstated the testimony of several of the doctor-witnesses, that neither party requested a new trial on appeal, and that only one of four alleged acts of defendants' negligence involved the prescription of estrogen and birth control pills. These assertions present considerations that were ignored by the majority in its opinion disposing of the merits of this appeal.

Another significant issue raised by plaintiff is her claim that her constitutional right to due process of law has been infringed upon by this decision construing Supreme Court Rule 366 to permit reversal on a theory not raised by the parties in either the trial court or before this court.

In sum, since the majority has granted relief not sought on grounds not argued, I would prefer to see the parties have some opportunity to argue their respective positions regarding the issues deemed dispositive by the majority—even at this late date in the proceedings.