LENORA LAPIDUS, Plaintiff-Appellee, *v.* THERESA HAHN, Special Adm'r of the Estate of Louis Hahn, Deceased, Defendant-Appellant.

First District (4th Division)   No. 81—2401

Opinion filed May 26, 1983.

Paul L. Price, of Pretzel, Stouffer, Nolan & Rooney, Chartered, of Chicago (Robert Marc Chemers, of counsel), for appellant.

John C. Pendergast and Mary Jo Strusz, both of Fishman & Fishman & Saltzberg, P.C., of Chicago, for appellee.

PRESIDING JUSTICE ROMITI delivered the opinion of the court:

Plaintiff was injured on January 12, 1976, when she slipped on some ice while leaving the apartment building where she lived. She suffered a comminuted fracture of the left elbow. Her arm is now deformed and useless. The jury awarded her damages of $350,000 against the landlord; the trial court reduced this to $250,000. The landlord appeals, contending: (1) the trial court erroneously denied the defendant's motion for a directed verdict; (2) the plaintiff's issue instruction was erroneous; and (3) the jury was clearly prejudiced as shown by the excessive verdict returned.

The appellee in her brief asks the court to reinstate the original award.

Six witnesses testified at trial, all for the plaintiff. They were the plaintiff, her husband, John and Rose Tellima, who occupied the second-floor apartment of the two-story building, plaintiff's daughter, Phyllis Ruggerio, Frank Diakakis, who worked next door, and Dr. Ray, who had treated the plaintiff.

At the time of the accident, plaintiff and her husband lived on the first floor of a two-story building owned by defendant's decedent (hereinafter simply called defendant). The Tellimas occupied the top floor. Defendant did not live in the building but according to plaintiff he came by every day.

The building is a brick building, with a sloped roof. A series of about eight cement steps lead up to two doors, the one on the left being the Lapiduses', the one on the right the Tellimas'. These doors are not in the center of the building but occupy the right third of it. There is a railing on both sides of the stairs—it goes all the way to the doors. The top step, or platform as it is called by the witnesses, is not protected by the roof but is open to the sky.

At the time of the accident, plaintiff was nearly 56 years of age. She had been a diabetic for about 20 years. She and her husband had occupied the apartment for 2½ years. During that whole time, whenever it rained or snowed, water dripped from the roof onto their door and onto the platform in front of their door where it formed a puddle. It did this every time it rained or snowed. There was a "corrosion" on the platform caused by these constant puddles. This watermark had been present since the time they moved in. According to the photograph in evidence the watermark did not come up to the door of the

apartment but ended several inches in front of the door. Plaintiff testified that the water hit their door and not the Tellimas'. However, the picture indicates the water mark extended at least partially in front of the Tellimas' door. Plaintiff testified the puddle only disappeared by evaporation. There was also a crack running the length of the platform near the step. It was not a wide crack and did not directly cause the plaintiff's fall. However, she said it "formed the puddle."

On the day in question there was, as usual, an ice patch in front of the door. It was one-quarter inch thick. It had not been there a week before but since plaintiff had not been out she did not know when it had been formed. Likewise she did not know whether the temperature was above or below freezing. Plaintiff was running short of insulin and decided to go to the drugstore. She was aware of the ice puddle in front of the front door but decided to use those stairs because the back stairs looked worse. She opened the door, which swung in, and stepped out, closed the door and turned to grab the railing. She slipped and fell on her left elbow, crushing the bones. She was taken to the hospital where Dr. Ray treated her; he operated on her the next day. Throughout this period she was in excruciating pain and was given pain pills. The last time she saw Dr. Ray was about a year or year and a half after the accident. He mentioned various surgical possibilities. However, because plaintiff had gone into a coma after an operation in 1960, she was afraid to have another one. Plaintiff took prescriptive pain pills for about two years, then quit because she was becoming addicted to too many. Now she takes Extra Strength Tylenol when she experiences pain, which she does at least once a day. She can now do very little around the house. Generally she just does needlework and watches television. Her daughter and her children take care of her and her husband. Plaintiff showed her arm to the jury. Photographs introduced in evidence show the left arm as distorted and bent. Plaintiff agreed that she was right handed and it was her left arm that had been injured.

Alfred Lapidus agreed with his wife that ever since they had lived there puddles had accumulated on the platform whenever there was any form of precipitation. Ice puddles would form from the drippings whenever it was very cold out. If it was a water puddle, it would either run off or evaporate. Likewise, the platform itself was uneven in that there was an indentation in front of the door. This condition had existed before they moved in.

About a week before the accident there had been about 2½ or three inches of snow. Mr. Tellima had cleaned off that accumulation.

After the snow it had gotten very cold and did not warm up, but it was warm the afternoon before the accident. It had to be above freezing because the water was running down from the roof and there was no other way it would drip. However, Alfred admitted dripping occurred when the sun would shine on the snow on the roof and melt it.

He went out the afternoon before the accident. There was no accumulation on the landing at that time. Water was pouring down from the roof onto the door and onto the landing. There was a puddle of water in front of the door at least the width of the door.

On the day of the accident he saw the platform when he went to get the mail about 8:30 or 9 a.m. The mailbox is on the outside of the apartment. He saw the accumulation of ice, about one-half inch or one inch thick, in front of the door in the puddle, the area around the puddle. This was the same area in which he had seen the water the afternoon before. There was a little dripping from the roof at the time.

He further testified that at the time of the accident (he was not an eyewitness) it was above freezing. He knew this because the streets were clear and wet. "The streets and sidewalks and the steps were, had a slight accumulation of ice. But the sidewalks were wet, street was wet." He did not know whether it had rained or snowed the night before.

John Tellima lived in the second-floor apartment. He had done things around the building for the landlord. In return, his rent was originally reduced by $35, but later this amount was decreased by $10; he agreed he was mad at the landlord because of this.

He testified that the ice that formed on the landing came from dripping which occurred when the sun would shine and melt the ice on the roof. He had told the landlord about this a couple of times before the accident.

When it snowed before the accident, he shovelled and took everything away. He agreed that rain and snow fell during the night before the accident. At trial he stated that it was dripping from the roof on the day of the accident. (In a previous deposition he had said it was not dripping on that day.) He also stated it had been dripping from the roof the night before.

Rose Tellima likewise testified that, whenever there was snow on the roof and the wind blew the snow over and the sun shone, it would melt and drip, running down either of the front doors. When the witness came down that morning the platform was all ice and water; there was "a little bit ice." She did not know how the ice had gotten there. She could hardly get from one front to another. She had to hang on to the posts of the doors to get to plaintiff's house. Other-

wise she probably would have fallen.

Frank Diakakis owned a snack shop next to the house. At the time of the accident he had owned it for about two years. Prior to the accident he had noted that water dripped from the roof of the house across the landing and the whole front whenever it rained or snowed. It would come forward and hit the landing or the front of the building. He had had an opportunity to observe this because at times mail for that address was put in his box by mistake and he would take and put it in the proper mailbox. At those times if it was wet out there would be quite a lot of water on the landing because of the buckle on the front landing. By buckle he meant an inversion. During the time he was in the area he did not, however, notice any damage to any of the outside shingles as a result of the water dripping from the roof or any change or damage to the doors

The night before the accident it was clear but "they" were predicting a storm and rain and ice. There was some kind of accumulation of ice or snow during the night. However, when he was coming to work the next morning the streets and sidewalks were all clear, even his sidewalk, although no one had shovelled it. Any accumulation, if there had been any, had melted by itself.

Diakakis did not witness the accident itself but he did come to plaintiff's assistance and helped her into her apartment. At that time all of the stairs and the top landing had quite a bit of ice on them, more so on the top landing where the buckle was. He had a difficult time standing there because of the ice which, at the center point of the buckle, was at least one-quarter inch thick. In the buckle it covered at least four to five feet.

Phyllis Ruggerio, the plaintiff's daughter, testified that before the accident her mother was a very independent and active woman. She never would let anybody do anything for her. She would wait on her husband hand and foot and even come over and wait on the Ruggerios.

After the accident, at first she would not put on regular clothes; she simply lived in a bathrobe for about a year. She would not go out because of the pain and because she was embarrassed at the way she looked. To the day of the trial she would only go out or do anything of that nature if the witness or her sister encouraged her to do so.

A few years after the accident the Ruggerios bought the house next door to them for the Lapiduses. The Ruggerios do their household chores. Plaintiff can do certain things but she needs help with everything. Phyllis drives her when they go shopping and carries things for her.

After the accident plaintiff was treated by Dr. Ray, an orthopedic surgeon. He testified that she sustained a comminuted fracture of the distal humerus in the left elbow, a pain-producing injury in his opinion. He operated on the elbow the day after the accident. He found that one of the big bones, the arm bone, which takes part in the joint, was severely broken. He could see about five or six fragments. One of these he had to remove; the rest he put together with screws and pins. Plaintiff stayed in the hospital for another eight or nine days. After that she was given a special brace on the arm and sent home. He continued to treat her for the next year and a half until March 11, 1977. That was the last date he treated her.

At that time she had pain and a lot of problems. The broken pieces were not mending as he had expected. The bones "are going this way, and that way." He informed her of some alternate forms of treatment: (1) to fuse the bones together, (2) to replace the joint and restore motion in the elbow or (3) to do a bone graft. He did not "recommend" any of them but he did advise her to have her surgery if she could.

He testified that in his opinion the injury and the resulting pain was permanent in nature.

The jury returned a verdict for plaintiff for $350,000. Initially the court on September 1, 1981, in light of *Brandel v. Yellow Cab Co.* (1981), 98 Ill. App. 3d 88, 423 N.E.2d 1237, held the verdict could not stand and ordered a new trial if plaintiff did not consent to a remittitur to $250,000 within seven days. The defendant moved for a new trial on September 14, 1981, on the basis that plaintiff had not consented to the remittitur. Orally the plaintiff did accept the remittitur and the court modified the judgment accordingly.

## I

■ It is true, as defendant urges, that in Illinois a landlord has no common law duty to remove natural accumulations of ice and snow from common areas (*Gehrman v. Zajac* (1975), 34 Ill. App. 3d 164, 340 N.E.2d 184), and is not liable for injuries resulting from a natural accumulation of ice and snow. (*Lewis v. W. F. Smith & Co.* (1979), 71 Ill. App. 3d 1032, 390 N.E.2d 39.) This rule is not applicable, however, where the landlord in some way caused an unnatural accumulation or aggravated a natural condition. (*Erasmus v. Chicago Housing Authority* (1980), 86 Ill. App. 3d 142, 407 N.E.2d 1031; *Lewis v. W. F. Smith & Co.* (1979), 71 Ill. App. 3d 1032, 390 N.E.2d 39.) The jury considering the evidence in this case, including the fact that water repeatedly dripped in torrents from the roof onto the platform and was

trapped there by the depression and that there was no ice or snow on the street or sidewalk, could reasonably have concluded that this ice was caused by the defective nature and construction of the roof and abetted by the depression in the platform and thus was not a natural accumulation. (*Thompson v. Resnik* (1932), 85 N.H. 413, 159 A. 355; *Clapper v. Zubres* (1941), 261 App. Div. 850, 24 N.Y.S.2d 377, *aff'd without opinion* (1941), 285 N.Y. 770, 34 N.E.2d 914; *Betts v. Carpenter* (1927), 239 Mich. 260, 214 N.W.96.) As the court in *Betts* stated at 239 Mich. 260, 264-65, 214 N.W. 96, 98:

> "In regard to the question of the defendant's liability for the negligence charged, it should be noted that the ice and water on the sidewalk adjoining his premises did not get there from natural causes. They were turned onto a public sidewalk by artificial means, by the manner in which the building was erected and maintained.
>
> 'An abutting property owner who creates a condition which artificially turns water across a sidewalk in such a way as to freeze and render the walk unsafe, is guilty of creating and maintaining a nuisance, and is liable for injury to pedestrians thereby caused.' 13 R.C.L. p. 416; sec. 342, and cases cited."

■ Nor is this result unreasonable. The rule exonerating landlords from liability for natural accumulations recognizes the climatic vagaries of this area with its unpredictable snowfalls and frequent temperature changes. Snowstorms cannot be foreseen or controlled. Thus it has been considered that another standard would impose an unreasonable burden of vigilance and care on landlords. (*Gehrman v. Zajac* (1975), 34 Ill. App. 3d 164, 340 N.E.2d 184.) But the construction and maintenance of the landlord's premises are within his control. It is not imposing an undue burden on him to require him not to add to the difficulties facing Illinois residents from natural accumulations of ice and snow by permitting unnatural accumulations due to defective construction or improper or insufficient maintenance of the premises. *Erasmus v. Chicago Housing Authority* (1980), 86 Ill. App. 3d 142, 407 N.E.2d 1031; *McCann v. Bethesda Hospital* (1979), 80 Ill. App. 3d 544, 400 N.E.2d 16.

## II

■■■ Defendant contends that the trial court erred in submitting as an issue to the jury whether the defendant allowed the roof to become in such a state of disrepair that water would leak from it and in refusing to instruct the jury that plaintiff was required to exercise ordinary care to obtain medical treatment.

The defendant is correct in her contention that there was no evidence the roof was in a state of disrepair. However, the defendant failed to raise this objection at the instruction conference. Accordingly the error is waived. *Malavolti v. Meridian Trucking Co.* (1979), 69 Ill. App. 3d 336, 387 N.E.2d 426; *LaPlaca v. Gilbert & Wolf, Inc.* (1976), 37 Ill. App. 3d 259, 345 N.E.2d 774.

There was no evidence in the record tending to show that plaintiff failed to take ordinary care to obtain medical treatment. To the contrary there was evidence she did. But she was not required to undergo a serious operation to minimize the liability of a tortfeasor (*Howard v. Gulf, Mobile & Ohio R.R. Co.* (1957), 13 Ill. App. 2d 482, 142 N.E.2d 825; *Montgomery v. Terminal R.R. Association* (1979), 73 Ill. App. 3d 650, 392 N.E.2d 77; 15 Ill. L. & Prac. *Damages* sec. 95 (1968)), especially since she was a diabetic and it appeared from her previous medical history that any such operation could be highly dangerous. A tortfeasor must take his victim as he finds her. Furthermore, while Dr. Ray mentioned certain surgical possibilities there was no evidence that any of these operations would have been successful or to what degree any of them would have improved her condition.

### III

■ Plaintiff's total medical and hospital expenses were only $3,695. The jury returned a verdict of $350,000. The trial court found that there was nothing in the trial court record which could be construed as an appeal to passion and prejudice. But it concluded that in light of recent decision of *Brandel v. Yellow Cab Co.* (1981), 98 Ill. App. 3d 88, 423 N.E.2d 1237, a verdict of $350,000 could not stand and one of $250,000 would be reasonable.

In *Brandel*, the appellate court reduced an award from $150,000 to $100,000, the amount requested in the complaint. In that case the plaintiff had suffered a broken hip, undergoing surgery and incurring hospital expenses in the amount of $2,800. But unlike the present case there was apparently no evidence that the injury restricted his normal activities. Under the circumstances we do not find *Brandel* either persuasive or controlling.

The question of damages is one of fact for the jury and ordinarily the court will not substitute its judgment for that of the jury. (*Wanner v. Keenan* (1974), 22 Ill. App. 3d 930, 317 N.E.2d 114; *Santiemmo v. Days Transfer, Inc.* (1956), 9 Ill. App. 2d 487, 133 N.E.2d 539.) The award was about 100 times greater than the special damages incurred. However, while the ratio of special damages to the amount of the verdict is a consideration, it is not the sole consideration in deter-

mining whether the award is excessive. (*Wanner v. Keenan* (1974), 22 Ill. App. 3d 930, 317 N.E.2d 114.) Rather the true test is whether the total amount of the verdict falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience. (*Chapman v. Foggy* (1978), 59 Ill. App. 3d 552, 375 N.E.2d 865.) In light of the deformity which has totally destroyed plaintiff's lifestyle and the extreme pain which she suffered we do not believe that it was. Accordingly, while we affirm the judgment for the plaintiff we modify the award, reinstating the original verdict of $350,000.

Judgment affirmed; award modified reinstating original verdict.

JOHNSON and JIGANTI, JJ., concur