2020 IL App (1st) 182407-U

SIXTH DIVISION
March 13, 2020

No. 1-18-2407

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| LUZ TELLADO, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 15 L 12283 |
| CITY OF CHICAGO, a Municipal Corporation, | ) | |
| SP PLUS, f/k/a STANDARD PARKING CORP., | ) | Honorable |
| WINGREN LANCSCAPING, INC., and | ) | Patricia O'Brien Sheahan, |
| A & R JANITORIAL, INC., | ) | Judge Presiding. |
| | ) | |
| Defendants-Appellees. | ) | |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Cunningham and Connors concurred in the judgment.

**O R D E R**

¶ 1   *Held*: Summary judgment affirmed where evidence plaintiff offered in response to the defendants' motions, that the ice patch on which plaintiff fell was an unnatural accumulation and that defendants who voluntarily undertook to remove snow or ice performed negligently, was too speculative to create any genuine issue of material fact.

¶ 2   Plaintiff Luz Tellado slipped and fell on a patch of ice while getting out of her car on the

sixth floor of O'Hare International Airport's elevated parking structure and tore her rotator cuff, which resulted in permanent injury. Ms. Tellado sued the City of Chicago (City) as the property owner, SP Plus as the property manager, Wingren Landscaping, Inc. (Wingren) as the subcontractor charged with plowing snow, and A & R Janitorial, Inc. (A & R), as the custodial staff, for negligence. On appeal, Ms. Tellado argues that the circuit court erred when it granted summary judgment for all defendants. For the following reasons, we affirm the judgment of the circuit court.

¶ 3                                    I. BACKGROUND

¶ 4      Ms. Tellado testified in her deposition that she drove to O'Hare International Airport with her aunt and her significant other to drop the latter off for a flight at around 8:30 a.m. on December 10, 2014. She stated that the weather was clear and cold that morning and that she did not see any rain or snow. Ms. Tellado was directed to floor six, the top floor, of O'Hare's elevated parking structure by an employee. She dropped off her two passengers and then proceeded to park the car, planning to meet them at the elevators. Ms. Tellado testified that the surface of the parking garage was not cracked or uneven and there were no potholes. She also stated that she did not notice moisture or ice where she parked her car. Upon exiting her car, however, Ms. Tellado slipped on a patch of ice located under the driver-side door and fell on her left side. No one saw her fall. Ms. Tellado testified that she did not see any snow piles, any run-off from snow piles, or anything that might have caused the ice.

¶ 5      Ms. Tellado immediately reported the incident to SP Plus. She also went to the doctor's office that same day and was informed she had torn her rotator cuff in her left shoulder. Ms. Tellado had surgery on her shoulder on January 14, 2015. Following the surgery, she completed 10 months of physical therapy. Ms. Tellado testified that she has been physically limited after the incident

and is frequently in pain.

¶ 6   Ms. Tellado filed her third amended complaint—the operative complaint in this case—on November 22, 2017, against the City, SP Plus, Wingren, and A & R. The complaint alleged that Ms. Tellado fell on ice that resulted from the negligence of all defendants.

¶ 7   The City and SP Plus filed a motion for summary judgment on January 31, 2018. Wingren and A & R filed motions for summary judgment on February 22, 2018. Ms. Tellado filed a response to their motions on April 16, 2018. Several documents, including deposition transcripts, were attached in support of the motions and response. The following is taken from those documents.

¶ 8   According to weather reports for the months of November and December 2014, there was 0.7 inches of snowfall on November 24 and 0.2 inches on November 25. Wingren plowed on November 24 and was called back on November 25 to spread urea, a salt substitute. Wingren was instructed to spread urea beginning at 4 a.m. on December 8 because ice was forming on level six but was sent home at 11 a.m. that day when the temperatures rose to above freezing and the precipitation turned to rain. The weather reports for December 8 listed 0.2 inches of precipitation. Wingren was not called back again until sometime after Ms. Tellado's fall on December 10.

¶ 9   The City, which owned the elevated parking structure, contracted with SP Plus to manage the public parking and ground transportation facilities. The contract required SP Plus to develop a snow removal plan for the parking facilities and to "coordinate with a snow removal Contractor as necessary to facilitate snow removal operations from the Parking Facilities." The contract also stipulated that SP Plus "w[ould] be responsible for the management of the Snow removal Contractor's efforts in the Parking Facilities."

¶ 10   SP Plus developed a snow removal plan for the winter of 2014 to 2015 and contracted with Wingren for snow removal services. The snow removal plan required SP Plus's employees to

notify "our snow removal contractors of any snow alerts, or any snow removal requests." The snow removal plan further stated that SP Plus "w[ould] monitor the contractor's work, verify staffing levels and assist in the general supervision of the snow removal contractors" and "contract with Wingren Landscaping Company for spreading Urea on Level [six] in the [elevated parking structure]." The snow removal plan also stated that "Wingren will provide laborers to remove snow and ice and spread Urea at all pedestrian centers and crosswalks on level [six]."

¶ 11      The subcontract between SP Plus and Wingren required Wingren to "provide landscaping and snow removal services conforming to the City-approved snow removal plan as pertains to the snow removal" of level six of the elevated parking structure. The subcontract specifically stated that SP Plus "acknowledge[d] that it is impossible and impractical to achieve the total elimination of snow from all areas" and that "[Wingren] [wa]s not engaged, nor d[id] it accept engagement as a continuing monitor of potentially dangerous or unsafe conditions which may arise by reason of thawing and refreezing of previously plowed or treated areas." Finally, the subcontract stated that "[a]ny additional services requested by Standard Parking and not contemplated in the Subcontract will not be performed until a written proposal has been approved and signed by management."

¶ 12      SP Plus also subcontracted with A & R. The subcontract's description of services listed "janitorial and related work" that "meet[s] or exceed[s] the 'General Maintenance Cleaning – Quality Standards.' " Those standards specified, among other things, that "[t]he entire parking facility should be policed and free of all litter and debris," "[a]fter facility cleaning activities, the parking areas should be sufficiently clean that they, at a minimum, are free of standing water, dirt, debris, and other foreign materials," and "[s]tanding water should not be left on any floor."

¶ 13      Paul Gallinaro, the regional manager of SP Plus starting in September 2014, testified that in addition to their custodial duties, A & R would also "generally look for hazardous conditions"

4

which he stated *could* include ice and snow. However, he also emphasized that snow and ice removal was not in A & R's subcontract and that someone would have to notify them to apply salt to icy areas. The quality control manager and snow commander for SP Plus, Don Caputo, also testified that it was not A & R's responsibility to salt where Ms. Tellado fell. Kimberly Pintor, an owner, senior executive vice president, and director of human resources for A & R, confirmed that A & R would salt on occasion, but only when asked and never in the parking stalls on level six of the parking structure. She further stated that A & R chose to not contract with SP Plus to do snow removal for the elevated parking structure, specifically limiting their duties to traditional custodial services.

¶ 14    Ms. Tellado argued that defendants had liability in this case because the ice she fell on was an unnatural accumulation resulting from defendants' negligence and because defendants voluntarily undertook to remove the ice and snow and were negligent in fulfilling these contractual duties.

¶ 15    Ms. Tellado's claims rely in significant part on an affidavit from her expert witness, Mark Yandell, in which he stated that he was retained to provide expert testimony that "the ice which caused the plaintiff to fall was an unnatural accumulation." He attested:

> "When snow is inevitably pushed to the upper end of the parking stalls by snow removal contractors and subsequently melts, the water is unable to adequately drain from the parking stalls. The pavement is inadequate *** due to the existence of depressions in the parking stalls, melting snow that turns into water can't flow down without getting trapped inside the depressions and refreezes and turns to ice. That pattern results in the formation of unnatural accumulations of ice, in particular, at the location where [Ms. Tellado] fell. On the day of the occurrence, as a result of the weather during the months of November

5

and December 2014 and as a result of the downward slope and depressions in the parking stalls, an unnatural accumulation of ice formed at the location where [Ms. Tellado] fell. This condition was the result of the artificial piling of snow that gradually melted, flowed into depressions in the parking stall surface, and then refroze thereby creating an artificial accumulation of ice."

¶ 16    Mr. Yandell based his determination that snow was piled at the head of the parking stalls in part on the depositions of Mr. Gallinaro, Mr. Caputo, and Marcos Fernandez, the general manager of landside operations for the City. Ms. Tellado argued that these depositions, together, formed "custom and practice" evidence that Wingren plowed snow to the heads of the parking stalls. According to Mr. Yandell, the melting of this snow caused the patch of ice that Ms. Tellado fell on. In addition to the depositions, Mr. Yandell based his testimony on a visit to the elevated parking structure he took three years after Ms. Tellado's fall and weather reports for November and December 2014. Mr. Yandell stated that the ice patch would have been present for approximately one week, based on his theory of its origin. Finally, Mr. Yandell determined that SP Plus, Wingren, and A & R were all contractually obligated to remove snow and ice.

¶ 17    Mr. Caputo testified that while Wingren has pushed snow to the front of a parking space on occasion, the more general rule is that the contractor is "expected to put the snow at the end of each drive aisle, which is located at the main square, which is at the end of the main drive aisle. In a case where it's a bigger storm and more snow is up there, we take – we're allowed to take a couple of parking stalls in each of the parking aisles."

¶ 18    Mr. Gallinaro testified in response to being asked whether Wingren plows snow to the head of a parking stall, "[i]f they were to clear out a stall, it may be that they put it – push it to the front of the stall. But it could also be that they push it through the stall and through the stall on the

opposite side to another location." Carlos Aguilera, the onsite supervisor for Wingren, testified that they do not push the snow up to the top of the parking stall when plowing. Instead, he stated, "we always push the snow in one direction to the end." Emilio Gervasio, SP Plus's operations manager, also testified that Wingren would not push snow to the heads of the parking stalls.

¶ 19    Mr. Fernandez testified to the following during his deposition:

"Q: While you were up on level [six] did you ever notice any water accumulating and depressions in any of the parking stalls?

A: No.

* * *

Q: Do you recall ever seeing snow that was shoveled to the head of a parking spot on level 6?

A: No.

Q: Did you ever see snow that had been – that was melting and going down away from the head of the parking stall?

A: Possibly. Not that I – But I don't know a specific instance of it.

Q: But it's something you may have seen?

A: I could have, yeah.

Q: And would that have been in the winter of 2014?

A: I wouldn't be able to get a specific date."

¶ 20    A & R moved to bar Mr. Yandell's affidavit and, along with the three other defendants, moved for summary judgment. On June 18, 2018, the circuit court held that Mr. Yandell was "not qualified to provide any opinions or testimony regarding contractual interpretations for any purpose at arbitration and/or trial." The court also entered an order granting summary judgment in

favor of A & R, the City, and SP Plus. The court stated in its order that "plaintiff fell on a natural accumulation of ice." Wingren's motion was granted in part and denied in part, but the court later granted the motion in full after Wingren filed a motion to reconsider.

¶ 21    Ms. Tellado moved to reconsider the entry of summary judgment for defendants. During the October 17, 2018, hearing, in which the court denied Ms. Tellado's motion to reconsider, the court summed up the reason for its ruling saying that Ms. Tellado:

> "has not been able to provide any competent witness testimony or other evidence that the ice she slipped on was an unnatural accumulation. The plaintiff attempts to prove that the ice was an unnatural accumulation by pointing to her expert who stated that when snow is pushed to the upper end of the parking stalls and subsequently melts, the water cannot adequately drain and, therefore, puddles in the uneven pa[ve]ment; but none of this can overcome the fact that no one saw any snow piled in the parking garage that day, the day the plaintiff fell. Plaintiff herself saw no piles of snow and plaintiff had no idea what caused the ice to form."

¶ 22    The court also clarified its earlier order stating, "it is that [Ms. Tellado] cannot establish through competent evidence that the ice she slipped on was an unnatural accumulation of ice as opposed to this Court holding as a matter of law that it was a natural accumulation."

¶ 23    Ms. Tellado now appeals.

¶ 24                                        II. JURISDICTION

¶ 25    The circuit court entered its final judgment on October 17, 2018, and Ms. Tellado filed her timely notice of appeal on November 13, 2018. This court has jurisdiction pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 26                                III. ANALYSIS

¶ 27    Summary judgment is reviewed *de novo* and is only appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113 (1995). " 'Genuine' means there is evidence to support the position of the nonmoving party" (*Pekin Insurance Co. v. Adams*, 343 Ill. App. 3d 272, 275 (2003)) and speculation is insufficient to establish a genuine issue of material fact (*Frederick v. Professional Truck Driver Training School, Inc.*, 328 Ill. App. 3d 472, 477 (2002)). The record is construed strictly against the movant and in favor of the nonmoving party. *Allen v. Cam Girls, LLC*, 2017 IL App (1st) 163340, ¶ 28.

¶ 28    Ms. Tellado argues that the circuit court erred in granting summary judgment to all defendants because she raised a genuine issue of material fact as to whether (1) the ice upon which she slipped was an unnatural accumulation and (2) defendants are liable under the theory of voluntary undertaking.

¶ 29    We address each issue in turn. As we recently recognized, "[t]he law distinguishes between landowners and those who contract with the landowner to remove snow and ice." *Mickens v. CPS Chicago Parking, LLC*, 2019 IL App (1st) 180156, ¶ 22. We will start by addressing the liability of the City, as the landowner, under the natural-accumulation rule.

¶ 30                         A. The Natural-Accumulation Rule

¶ 31    Ms. Tellado first argues that she raised a genuine issue of material fact as to whether the ice she fell on was an unnatural accumulation. We disagree.

¶ 32    Illinois's natural-accumulation rule limits a landowner's liability in negligence actions stemming from slip-and-falls on natural accumulations of snow or ice. *Allen*, 2017 IL App (1st) 163340, ¶ 29. Because Illinois experiences "unpredictable snowfalls and frequent temperature

9

changes," the general rule is that a landowner has no duty to remove natural accumulations of snow or ice. *Murphy-Hylton v. Lieberman Management Services, Inc.*, 2016 IL 120394, ¶ 19. Natural accumulations are "caused by the mere falling and settling of snow or precipitation." *Mickens*, 2019 IL App (1st) 180156, ¶ 26.

¶ 33     A landowner may, however, be held liable for an injury caused by an unnatural accumulation of snow or ice, such as snow piled after plowing. *Id.* ¶¶ 28-29. This is because courts do not consider it an undue burden for landowners "not to add to the difficulties facing Illinois residents from natural accumulations of ice and snow by permitting unnatural accumulations due to defective construction or improper or insufficient maintenance of the premises." *Lapidus v. Hahn*, 115 Ill. App. 3d 795, 801 (1983). To prevail on a claim of negligence based on an unnatural accumulation, a plaintiff must prove (1) the accumulation of snow or ice was unnatural and (2) the landowner had actual or constructive knowledge of the dangerous condition. *Jordan v. Kroger Co.*, 2018 IL App (1st) 180582, ¶ 18. Because "[a] finding of an unnatural *** condition must be based upon an identifiable cause of the ice formation," a plaintiff is required to present "some facts to show the origin of the ice was unnatural." *Gilberg v. Toys R Us, Inc.*, 126 Ill. App. 3d 554, 557-58 (1984).

¶ 34     Ms. Tellado argues, based on the testimony of her expert witness, Mr. Yandell, that she presented some facts to show the ice she fell on was caused by snow that was piled up at the head of the parking stall on November 24, 2014, that proceeded to melt and refreeze over the next two weeks when temperatures fluctuated above and below freezing. She argues that that the testimony of Mr. Caputo and Mr. Gallinaro amounts to evidence that it was "custom and practice for Wingren to push snow to the front of the parking stalls." Ms. Tellado also claims that Mr. Fernandez "admitted to having seen snow that had been located at the head of a parking stall on level six and

that was melting and flowing down away from the head of the parking stall." Ms. Tellado argues that, all together, this evidence was enough to create a genuine issue of material fact as to whether the ice she slipped on was a natural or an unnatural accumulation.

¶ 35    All defendants argue in response that Mr. Yandell's affidavit is insufficient to create a genuine issue of fact. They stress that no one saw snow piles or run-off the day Ms. Tellado fell and that Mr. Yandell's testimony, without more, is too speculative because he never measured the slope of the parking lot or the depth of the depression. Defendants argue that, moreover, there is no testimony that Wingren plowed the snow to the head of the parking stalls on November 24, 2014. Finally, defendants argue that Ms. Tellado has mischaracterized the testimony of Mr. Caputo and Mr. Gallinaro in claiming that it was custom or habit for Wingren to plow snow to the head of the stall.

¶ 36    Illinois has adopted Federal Rule of Evidence 406 as Illinois Rule of Evidence 406 (eff. January 1, 2011) regarding the admission of habit and routine practice evidence. *Jacobs v. Yellow Cab Affiliation, Inc.*, 2017 IL App (1st) 151107, ¶ 96. Under that rule, the "conduct [must be] 'semiautomatic, invariably regular and not merely a tendency to act in a given manner;' [citations] '[i]t is the notion of virtually invariable regularity that gives habit its probative force.' " *Id.* ¶ 97 (quoting *Alvarado v. Goepp*, 278 Ill. App. 3d 494, 496-97). Here, Mr. Caputo testified that the expectation is for Wingren to push snow to the end of the drive aisle, not the head of a stall and Mr. Gallinaro testified that Wingren generally plows just the aisles. While Mr. Caputo testified that snow had been plowed to the heads of the parking stalls before, it cannot be said that such a statement demonstrates "semiautomatic" or "invariably regular" conduct of plowing snow to the heads of the parking stalls, and it would therefore be improper to assume that Wingren pushed snow to the heads of the parking stalls following the snowfall on November 24, 2014, without any

11

other supporting evidence. "[A]n inference of negligence [cannot] be established on inferences which are themselves speculative in nature." *McCormick by McCormick v. Maplehurst Winter Sports, Ltd*, 166 Ill. App. 3d 93, 100 (1988).

¶ 37 The testimony of Mr. Fernandez likewise does not provide support to Ms. Tellado's argument. In his deposition, Mr. Fernandez first stated that he did not recall ever seeing snow shoveled to the head of a parking stall on level six of the elevated parking structure. He also stated he did not think he ever saw water accumulating in depressions on level six. When asked if he ever saw snow melting from the head of a parking stall he replied, "[p]ossibly. Not that I – But I don't know a specific instance of it." This response, at most, leaves open a possibility that snow could have melted down the parking stall at some point in time. Such speculation alone, especially when examined in the context of Mr. Fernandez's entire deposition testimony, where he states that he never saw snow piled at the head of a parking stall on level six, is not nearly enough to create a factual issue.

¶ 38 Ms. Tellado cites four main cases to support the argument that the evidence she provided was sufficient to raise a genuine issue of fact that she was injured as the result of an unnatural accumulation. However, all of the cases are distinguishable in critical ways.

¶ 39 Ms. Tellado first argues that *Sims v. Block*, 94 Ill. App. 2d 215 (1968), is analogous because "[s]imilar to the case at bar, the *Sims* parking lot had last been plowed 10 days before [the] plaintiff's fall and there had been thawing in the intervening time period." In *Sims*, the plaintiff parked his car in the parking lot of his apartment building, exited his car, and slipped and fell on a "built-up ridge of ice and snow." *Id.* at 218. Both the plaintiff and his daughter, who examined the parking lot the day following the accident, stated that a ridge of ice and snow was present along the driver-side of the plaintiff's car. *Id.* Further, the defendant-landowner testified that "water and

12

moisture drained to some extent from the surrounding higher ground to the east down into the parking lot" and that "there were spots in the lot where the snow melted 'and it might have been frozen.' " *Id.* at 218-19. The defendant also said that snow was left after plowing. *Id.* at 219. There was no precipitation in the 10 days between plowing and the plaintiff's fall. *Id.* The court in *Sims* found this to be sufficient evidence from which the jury could have found the ice was the result of an unnatural accumulation. *Id.* at 223.

¶ 40    In *Ordman v. Dacon Management Corp.*, 261 Ill. App. 3d 275, 276-77 (1994), the plaintiff's decedent slipped and fell on ice at the entrance of his apartment building's garage. No one saw the decedent fall, however, a person in the parking lot heard an "uh" sound and saw the decedent lying on his back on a patch of ice. *Id.* at 278. That witness testified that plowed snow was piled "in certain areas, including the area in front of the garage doors." *Id.* There were only trace amounts of snow recorded in the intervening days between plowing and the date of the accident. *Id.* The court reasoned that there was sufficient evidence to raise a question of fact as to whether "the plows left behind patches of snow in the lot, including the area in front of [the decedent's] garage, and that these areas of snow would melt and re-freeze." *Id.* at 281.

¶ 41    Ms. Tellado also points to *Webb v. Morgan*, 176 Ill. App. 3d 378 (1998). In *Webb*, snow was plowed in large piles up to two and a half feet high around a parking lot of a mobile home residential area. *Id.* at 381. A codefendant in the case testified that when the temperatures rose above freezing, the snow piles would melt into the parking lot and the lot would become slick when it would freeze over again. *Id.* The plaintiff in the case retained numerous expert witnesses, including one who testified "the common parking area where the plaintiff fell had a downward slope of two percent, and that water flowing down that parking area would have a tendency to collect and puddle in the area where the plaintiff fell." *Id.* at 381. The expert testimony was coupled

13

with witness testimony of how the snow was piled the last time it was plowed. *Id.*

¶ 42     The evidence in Ms. Tellado's case is missing a critical component of the evidence in these three cases. Simply put, there was no evidence in Ms. Tellado's case that snow was actually piled up or that other actions of the landlord or its agents caused the accumulation. Here, there was no testimony that Wingren plowed the snow to the head of the stall on November 24 or any other specific date, and, according to Ms. Tellado, there were no snow piles on level six of the elevated parking structure on the day of her fall. Further, as discussed above, deposition testimony concerning how Wingren plows does not rise to the level of habit or routine practice evidence.

¶ 43     In addition, in contrast with the cases above, in this case there was evidence of recent precipitation which, if it had caused the ice to form and Ms. Tellado to fall, would have been the kind of natural accumulation that landlords are not liable for. Because there was precipitation that occurred two days prior to Ms. Tellado's fall, any ice that formed could have been a result of that precipitation. This possibility means that we cannot draw an inference that the ice must have been caused by the melting of piled up snow. *Cf.*, *Mickens*, 2019 IL App (1st) 180156, ¶ 42 (genuine issue of material fact existed as to unnatural accumulation where snow was removed, ice the plaintiff fell on was on a sloped ramp, temperatures fluctuated in the days preceding the fall, there was no intervening precipitation, and there were snow piles immediately above the ramp).

¶ 44     The fourth case Ms. Tellado relies heavily on is *Lapidus*, where the plaintiff slipped and fell on a patch of ice when leaving her apartment building. 115 Ill. App. 3d at 797. Multiple witnesses testified that every time it rained, water would drip from the roof and collect in a puddle in front of the plaintiff's door. *Id.* at 796. The puddle corroded the cement and there was also "a crack running the length of the platform near the step" that the plaintiff said "formed the puddle." *Id.* at 797. The jury returned a verdict in favor of the plaintiff and, on appeal, this court affirmed,

stating "[t]he jury considering the evidence in this case including the fact that water repeatedly dripped in torrents from the roof onto the platform and was trapped there by the depression and that there was no ice or snow on the street or sidewalk could reasonably have concluded that this ice was caused by the defective nature and construction of the roof and abetted by the depression in the platform and thus was not a natural accumulation." *Lapidus*, 115 Ill. App. 3d at 800-01.

¶ 45    While *Lapidus* confirms that negligent maintenance can give rise to a claim, it is an extreme case that is not factually analogous. Ms. Tellado has presented no evidence of precipitation invariably puddling in the specific depression where she slipped. She has also not provided any evidence of a crack in the parking garage, only a depression of unknown depth. Without knowing how deep it is, there is no basis for a finding of negligent maintenance of the premises. Lapidus is not controlling here. See *Morris v. Ingersoll Cutting Tool Co.*, 2013 IL App (2d) 120760, ¶ 12 ("minor defects are outside the scope of a landowner's duty to maintain the property in a reasonably safe condition"); *Cole v. Paper Street Group*, LLC, 2018 IL App (1st) 180474, ¶ 12 (affirmed summary judgment for the defendants where the plaintiff presented no evidence of rain habitually dripping off the roof and collecting on the step where she fell).

¶ 46    In short, Ms. Tellado cannot create a genuine issue of material fact based on an opinion from her expert that was purely speculative. She provided no actual evidence that the origin of the ice was unnatural or that the City negligently maintained the elevated parking structure. Because Ms. Tellado failed to establish the existence of a genuine issue of material fact on this point, the circuit court was correct in granting summary judgment to the City.

¶ 47    Ms. Tellado argues on appeal, as she did on her motion to reconsider, that the circuit court erred in finding, as a matter of undisputed fact, that the ice that she slipped on was caused by a natural accumulation of snow. We agree with her and so did the circuit court when it made clear

in its ruling on the motion to reconsider that it did not intend to make a finding that the injury was the result of a *natural* accumulation only that there was no evidence of an *unnatural* accumulation. We agree with what the circuit court said on rehearing—the problem for Ms. Tellado's case is that, while the ice might or might not have been caused by a natural accumulation of snow, there is simply no evidence that the City's actions created an unnatural accumulation of snow that melted into ice and caused her fall.

¶ 48    Because we agree with the circuit court's ruling on summary judgment, we find no error in the court's denying Ms. Tellado's motion to reconsider.

¶ 49                                    B. Voluntary Undertaking

¶ 50    Ms. Tellado also argues that she created an issue of material fact as to voluntary undertaking. A duty not found in the common-law can still be voluntarily assumed, often called a "voluntary undertaking." *Mickens*, 2019 IL App (1st) 180156, ¶ 58. Specifically, "one who undertakes, gratuitously or for consideration, to render services to another is subject to liability for bodily harm caused to the other by one's failure to exercise due care in the performance of the undertaking." *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 239 (1996). Thus, although a landowner has no common-law duty to remove a natural accumulation of snow, if he or she voluntarily undertakes to remove snow from the premises, then he or she is obligated to perform that assumed duty non-negligently. See, *e.g.*, *McBride v. Taxman Corp.*, 327 Ill. App. 3d 992, 996 (2002).

¶ 51    "Under a voluntary undertaking theory of liability, the duty of care to be imposed upon a defendant is limited to the extent of the undertaking." *Bell v. Hutsell*, 2011 IL 110724, ¶ 12. As we recently made clear in *Mickens*, the common law, including the law regarding natural accumulation, "has nothing to say about it." *Mickens*, 2019 IL App (1st) 180156, ¶ 58. Contracts

16

to undertake an activity, such as removing snow or ice, can create a duty. *Id.* ¶¶ 56-58. The terms of the contract define the scope a voluntary undertaking arising in the contract. *Id.* ¶ 58.

¶ 52    Under the Restatement (Second) of Torts, which has been adopted in Illinois (see, *e.g.*, *Pippin v. Chicago Housing Authority*, 78 Ill. 2d 204, 210-11 (1979)), this duty can be extended to third party beneficiaries of the contract, specifically:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, *** (c) the harm is suffered because of reliance of the other or the third person upon the undertaking." Restatement (Second) of Torts § 324A (1965).

¶ 53    In applying section 324A to cases involving injuries caused by snow or ice, defendants will be found negligent if (1) they promised to perform snow-removal services (2) to protect customers and (3) a customer is injured as a result of (4) their failure to perform that service with reasonable care, and (5) the customer relied on their promise. *Mickens*, 2019 IL App (1st) 180156, ¶ 62.

¶ 54    Ms. Tellado argues that all defendants voluntarily undertook to remove snow and ice from the elevated parking garage and performed negligently. However, Ms. Tellado again failed to present evidence to raise a genuine issue of material fact on that theory of liability as to any of the defendants.

¶ 55                                              1. The City

¶ 56    The City contracted with SP Plus to manage the elevated parking structure at O'Hare. There were no provisions in the contract requiring the City to engage in any snow or ice removal activities; therefore, the City is not liable under the voluntary-undertaking theory of liability

17

because it did not "promise to perform snow-removal services." *Id.*

¶ 57                                            2. SP Plus

¶ 58     SP Plus was contractually charged with developing a snow removal plan for the parking

facilities and with "coordinat[ing] with a snow removal Contractor as necessary to facilitate snow

removal operations from the Parking Facilities." SP Plus was also "responsible for the

management of the Snow removal Contractor's efforts in the Parking Facilities" under the contract.

Because SP Plus did have a contractual duty to relating to snow removal, the question is whether

Ms. Tellado was injured as a result of SP Plus's failure to perform its contractual obligations with

reasonable care. *Id.*

¶ 59     It is undisputed that SP Plus developed a snow removal plan and hired a snow removal

contractor. Ms. Tellado also does not argue that SP Plus managed Wingren negligently. Ms.

Tellado contends that SP Plus's "hiring of a snow removal contractor alone *** did not discharge

its duty." She argues that all "[d]efendants were negligent by failing to recognize the presence of

ice in [p]laintiff's parking stall for at least one week before she fell and by failing to either salt, set

up visible warning signs, or block off the parking stall to protect her." However, Ms. Tellado's

argument that the ice was present for a week is again based solely on Mr. Yandell's affidavit which

remains purely speculative. As discussed above, there was simply no evidence to support his

theory that the snow had been piled up and melted down to form the ice. We agree with the circuit

court that Ms. Tellado failed to raise a genuine issue of fact that SP Plus was negligent in its

voluntary undertaking and that summary judgment was proper in favor of SP Plus.

¶ 60                                            2. Wingren

¶ 61     Wingren's subcontract with SP Plus required it to "provide landscaping and snow removal

services conforming to the City-approved snow removal plan as pertains to the snow removal" of

level six of the elevated parking structure. It also stated that SP Plus "acknowledge[d] that it is impossible and impractical to achieve the total elimination of snow from all areas" and that "[Wingren] is not engaged, nor does it accept engagement as a continuing monitor of potentially dangerous or unsafe conditions which may arise by reason of thawing and refreezing of previously plowed or treated areas." The snow removal plan required Wingren to "provide laborers to remove snow and ice and spread Urea at all pedestrian centers and crosswalks on level [six]."

¶ 62    In addition to the general argument that all defendants failed to recognize the ice that had accumulated for at least a week which we have rejected for lack of evidence, as to Wingren specifically, Ms. Tellado claims that there were additional contractual duties. While she does not quite explain how the negligent performance of these alleged duties led to her injuries, it does not matter because we reject the premise that these duties existed.

¶ 63    Ms. Tellado relies on an email from January 2013 between Wingren's general manager at the time, Brian Dolwick, and SP Plus's regional manager at the time, Wayne Lasinski, concerning the snow-plow budget. In that email, Mr. Dolwick stated "[z]ero tolerance service to begin within 4 hours of any accumulating event." Mr. Aguilera, Wingren's onsite supervisor, clarified in his deposition that "zero tolerance service" meant "[w]e have to be there even if we have got one-eighth [inch] of snow." Ms. Tellado argues that this email was a contract modification requiring Wingren to leave zero snow or ice behind and gives them an additional voluntary undertaking.

¶ 64    Wingren responds that the email was not a contract modification and that "zero tolerance" refers to "response time by Wingren" and that "[w]hen an accumulating snow even occurred Wingren would begin plowing operations within four hours."

¶ 65    We agree that the email is not a contract modification. Wingren's subcontract states that it can only be modified "by written amendment signed by both parties." The email between the two

former managers has none of those trappings. The contract itself made clear that Wingren would not "accept engagement as a continuing monitor of potentially dangerous or unsafe conditions which may arise by reason of thawing and refreezing of previously plowed or treated areas." There is no indication that parties intended to modify that limitation on Wingren's voluntary undertaking and, according to testimony from Wingren's onsite supervisor, "zero tolerance" refers to response-time when called to plow.

¶ 66    Ms. Tellado has failed to show that Wingren was required to do more under its contract than it did or that it performed its contractual duties negligently. Thus, she has failed to raise a genuine issue of fact to support Wingren's liability.

¶ 67                                    3. A & R Janitorial

¶ 68    A & R's subcontract required them to provide "janitorial and related work" that "meet[s] or exceed[s] the 'General Maintenance Cleaning – Quality Standards.' " Relevant to those standards were the provisions stating, "[t]he entire parking facility should be policed and free of all litter and debris," "[a]fter facility cleaning activities, the parking areas should be sufficiently clean that they, at a minimum, are free of standing water, dirt, debris, and other foreign materials," and "[s]tanding water should not be left on any floor."

¶ 69    Ms. Tellado argues that A & R was "contractually obligated to salt icy parking stalls on level [six] of the [elevated parking structure] including the location where plaintiff fell." Ms. Tellado cites to the deposition testimony of Mr. Caputo to support this allegation that Mr. Caputo would call A & R to salt if he "observe[d] something." Nevertheless, there is no provision in A & R's subcontract that charges them with salting icy parking stalls. Indeed, Ms. Pintor testified that her company specifically chose not to provide snow and ice removal for the elevated parking structure. By all accounts, A & R would only salt when specifically asked to and never on the sixth

floor of the elevated parking structure.

¶ 70    Because A & R was not contractually obligated to perform snow or ice removal, and specifically did *not* voluntarily undertake snow or ice removal responsibilities, they had no duty under a voluntary-undertaking theory. *Mickens*, 2019 IL App (1st) 180156, ¶ 62. The circuit court therefore correctly granted summary judgment in favor of A & R.

¶ 71                                    IV. CONCLUSION

¶ 72    Ms. Tellado did not present evidence that created a material issue of fact as whether the ice she slipped on was caused by an unnatural accumulation or that it resulted from negligence by any defendant in fulfilling a voluntary undertaking. For these reasons, we affirm the judgment of the circuit court.

¶ 73    Affirmed.